PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOSEPH D. GRIGGS,
　　　　　　　*Plaintiff-Appellant,*

v.

E. I. DUPONT DE NEMOURS &
COMPANY,
　　　　　　　*Defendant-Appellee.*

No. 99-2508

JOSEPH D. GRIGGS,
　　　　　　　*Plaintiff-Appellant,*

v.

E. I. DUPONT DE NEMOURS &
COMPANY,
　　　　　　　*Defendant-Appellee.*

No. 99-2607

Appeals from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, District Judge.
(CA-98-17-7-F)

Argued: September 28, 2000

Decided: January 9, 2001

Before WILKINS, WILLIAMS, and TRAXLER, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Traxler wrote the opinion, in which Judge Wilkins and Judge Williams joined.

---

**COUNSEL**

**ARGUED:** Michael Murchison, MURCHISON, TAYLOR & GIB-SON, L.L.P., Wilmington, North Carolina, for Appellant. Raymond Michael Ripple, E.I. DUPONT DE NEMOURS & COMPANY, Wilmington, Delaware, for Appellee. **ON BRIEF:** Donna L. Goodman, E.I. DUPONT DE NEMOURS & COMPANY, Wilmington, Delaware; Gardner G. Courson, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Atlanta, Georgia, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

Joseph Griggs brought an action against his former employer E.I. DuPont de Nemours & Company ("DuPont") under section 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"), *see* 29 U.S.C.A. § 1132(a)(3) (West 1999). Griggs claimed that DuPont breached its fiduciary duty by leading Griggs to believe that he was eligible for a tax-deferred lump sum distribution of early retirement benefits under DuPont's Temporary Pension System and then failing to notify Griggs when DuPont learned that Griggs's election to receive such a distribution was not permitted by federal tax laws. Instead, DuPont made the distribution directly to Griggs which resulted in an immediate tax and defeated the reason that Griggs elected to retire early. The district court concluded that DuPont breached its fiduciary duty but held that ERISA does not provide the relief that Griggs seeks. We agree that, under these circumstances, DuPont breached its duty as an ERISA fiduciary. However, we conclude that Griggs is not necessarily without a remedy under ERISA, and we remand for the district court to explore the issue further.

I.

DuPont serves as the administrator for its Pension and Retirement Plan ("the pension plan"), a tax-qualified defined benefit pension plan under the Internal Revenue Code ("tax code"), *see* 26 U.S.C.A. § 401(a) (West Supp. 2000), and ERISA, *see* 29 U.S.C.A. § 1002(2),

(35) (West 1999). DuPont also administers a qualified contribution plan known as the Savings and Investment Plan ("SIP"). The SIP is a retirement savings vehicle akin to a 401(k) plan through which an employee's benefits accumulate on a tax-deferred basis.

In 1993, DuPont amended the pension plan to create a program called the Temporary Pension System ("TPS"). According to DuPont, TPS was designed to assist DuPont employees who were leaving their jobs at DuPont, but not necessarily retiring. A participant in TPS was entitled to one month of pay for every two years of service, not to exceed one year's salary, in addition to any other benefits from the pension plan to which the participant might be entitled. The TPS benefit could be received as either a lump sum payment or as an additional amount added to the employee's regular monthly pension payment. Benefits under TPS, however, were not universally available to DuPont employees at all times. Instead, TPS benefits were offered to employees for a limited "window" period, and the decision to make TPS benefits available occurred on the regional level.

Griggs was a long-time employee of DuPont. He began his employment in 1962 and eventually became operations manager for DuPont's nylon fibers division. Griggs was serving in this capacity when he elected early retirement in 1994. During the year or so preceding Griggs's retirement, DuPont was closing one of its nylon plants and, as a result, decided that a workforce reduction was necessary. It was Griggs's understanding that because of the decreased need for employees, DuPont decided to make TPS benefits available to employees in the nylon division as an incentive to retire early. DuPont, however, disputes that the purpose of TPS was to encourage early retirement; rather, the essential aim of TPS was "to provide transition assistance as employees move from a career with DuPont to a career elsewhere." J.A. 175.

Whatever the primary aim of TPS, everyone agrees that TPS benefits were made available in 1994 to a group of DuPont employees that included Griggs. And, given his long-term service, Griggs was among those employees who would be entitled, in addition to his regular pension, to a TPS benefit equivalent to a full year's salary.

Initially, Griggs was reluctant to consider leaving his position with DuPont and retiring early. Griggs was not being forced out of

DuPont, and there is nothing before us that suggests Griggs was being pressured to accept the TPS offer. In May 1994, however, Griggs received a written communication from DuPont providing details about TPS that caused him to reevaluate whether he should retire early. For Griggs, what really made the TPS offer attractive was the option to receive his full TPS benefit in a lump sum that could be "rolled over" from the pension plan into his SIP account with DuPont or another qualified vehicle where it would grow on a tax-deferred basis. In its description of the TPS program, DuPont explained that

> TPS provides a benefit from the Pension and Retirement Plan [ ] in addition [to the] other pension benefit[s] that you are currently eligible to receive. The additional benefit is as follows:

> One month of pay for every two years of service. Pay to include base pay, Shift Differential pay, Sunday Premium, scheduled overtime pay and any incentive compensation award made in the previous twelve months. The minimum benefit is equal to two months' pay, the maximum is twelve months' pay.

> This additional TPS benefit may be taken as a lump sum, or may be added to the monthly payments under an immediate or deferred pension. If taken as a lump sum, all or part of the lump sum can be rolled into the DuPont Savings and Investment Plan (SIP), or any qualified IRA, within 60 days.

> Because this benefit is paid from the Pension Trust, in some cases taking the lump sum without rolling it over will cause you to incur an early payment excise tax. If that applies to you, a tax gross up allowance will be paid to off-set any overall addition to your taxes.

J.A. 186. This was general, form language that was provided to all potential participants in TPS. Other than this May 1994 communication, DuPont did not make any representations to Griggs concerning the tax implications of his decision to take a lump sum distribution, nor did Griggs request any information from DuPont regarding the potential tax impact on him individually.

After receiving DuPont's written description of TPS benefits, Griggs opted for early retirement and elected to receive his TPS benefit in a lump sum, believing that he could roll it over into the DuPont SIP without incurring immediate tax liability. In July 1994, Griggs received a written statement indicating that, if he were to apply for TPS benefits, the amount of his lump sum distribution would be $132,900, which is about what he expected.

On August 1, 1994, Griggs applied for TPS benefits and filled out an application form for a lump sum payment of his TPS benefit. On the form, Griggs elected to receive "a lump sum payment of the additional pension benefit amount payable under Section XII of the Pension and Retirement Plan." Griggs was presented with various options for the form his lump sum payment would take; he selected the "ROLLOVER SETTLEMENT" which indicated Griggs's desire to "rollover [his] total lump sum benefit in accordance with the deposit information in Section 5." In turn, Griggs indicated in Section 5 of the application that the "[d]eposit is to be made to: SIP (fixed income)."

The reverse side of the application form contained instructions for completing the lump sum payment application. With respect to the lump sum election, the form instructed that "[y]ou have elected a lump sum payment pursuant to Section XII of the Pension and Retirement Plan. In making this election, you understand that it is YOUR responsibility to obtain independent financial and tax advice." Griggs concedes that he sought no such independent tax advice.

Griggs officially retired in late September 1994, and in October DuPont sent Griggs a notice indicating that DuPont was preparing to process his pension payments "in accordance with [his] election." J.A. 207. DuPont, however, did not honor Griggs's election to roll over his lump sum payment into the SIP plan, even though DuPont had said in its description of the TPS program that this could be done. In fact, as early as July 1994 — before Griggs even submitted his TPS lump sum payment application — calculations performed by DuPont showed that section 415 of the tax code would not permit Griggs to roll over his entire TPS benefit into the tax-deferred SIP account. These calculations were apparently performed during the process of providing Griggs with an estimate of the lump sum amount he could expect to receive if he participated in TPS. No one informed Griggs,

however, that there was a possibility that the tax code would not permit the entire lump sum to be paid from a qualified plan (like DuPont's pension plan) and that any portion not paid from a qualified plan could not be rolled over and would be taxed immediately.[1]

After Griggs submitted his lump sum payment application in August 1994, DuPont performed additional calculations required by section 415 of the tax code and determined that various limits imposed by section 415 barred Griggs from electing to roll over his entire TPS distribution into the SIP or an Individual Retirement Account. During this process, DuPont generated internal reports warning that Griggs was not eligible for the TPS election he made. By mid-September 1994, approximately two weeks before Griggs officially retired, DuPont had been put on notice by its internal calculations that most, if not all, of Griggs's lump sum distribution could not be rolled over into the SIP. Griggs was never advised of this critical fact. Griggs remained unaware of any problem with his election until he received a check in mid-November 1994 for approximately $133,000, his full TPS benefit. Because of the limits imposed by section 415 of the tax code, DuPont paid Griggs's lump sum payment not from the pension plan but from its Pension Restoration Plan, a non-qualified plan. As a result, Griggs was not able to roll the payment into the SIP and was forced to pay a tax of approximately $50,000.

---

[1]As DuPont later explained, section 415 of the tax code

> limits the amount of pension benefits that can be paid to certain highly-compensated individuals by tax-qualified pension plans such as the DuPont Pension and Retirement Plan. When the final calculation of Mr. Griggs' pensions benefit was made, it was clear that Section 415(e) of the Internal Revenue Code applied, and, because only distributions from tax-qualified plans can be rolled-over, none of Mr. Griggs' pension distribution could be rolled over.

> Compliance with Section 415 of the Code is not discretionary. Compliance is necessary to maintaining the tax-qualified status of both the DuPont Pension and Retirement Plan and the SIP.

J.A. 205. Therefore, DuPont paid Griggs his TPS benefit from DuPont's non-qualified Pension Restoration Plan, resulting in a fully taxable distribution.

Griggs sued DuPont in North Carolina Superior Court for negligent misrepresentation. Griggs alleged that DuPont made an offer of early retirement to him, using "an incentive lump sum payment in the amount of one year's salary" as an inducement. J.A. 11. The complaint further alleged that DuPont falsely represented that Griggs's "lump sum benefit could be 'rolled over into the DuPont Savings and Investment Plan (SIP), or any qualified IRA, within 60 days' thereby avoiding significant tax liability." J.A. 11. Griggs asserted that he suffered tax liability because "DuPont negligently failed to exercise reasonable care and competence in obtaining or communicating . . . information" relating to "Griggs' ability to roll the lump sum benefit into a qualified plan and thereby avoid taxes." J.A. 12.

DuPont removed the action to federal court and moved to dismiss on the grounds that Griggs's negligent misrepresentation claim under state law was preempted by ERISA. The district court denied the motion, relying on the Ninth Circuit's decision in *Farr v. US West, Inc.*, 58 F.3d 1361 (9th Cir. 1995) (*Farr I*), which held that ERISA did not preempt the plaintiffs' claim that their employer either fraudulently or negligently misled them regarding the tax consequences of a lump sum distribution under an early retirement program included in the employer's pension plan. *See id.* at 1365-67. The Ninth Circuit, however, revisited the issue after the Supreme Court subsequently handed down its decision in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), and held that, under the reasoning in *Varity*, ERISA preempted the state law fraud and negligent misrepresentation claims. *See Farr v. U.S. West Communications, Inc.*, 151 F.3d 908, 913 (9th Cir. 1998) (*Farr II*), *cert. denied*, 120 S. Ct. 935 (2000).

Not long after *Farr II* was issued, DuPont moved for summary judgment, again contending that ERISA preempted Griggs's state law negligent misrepresentation claim.[2] The district court reexamined the preemption issue in light of *Farr II* and concluded that ERISA preempted Griggs's claim; however, the district court properly permitted Griggs to amend his complaint to include a claim, based on the same facts, for breach of fiduciary duty under ERISA § 502(a)(3). *See* 29 U.S.C.A. § 1132(a)(3).

---

[2]Griggs filed a cross-motion for partial summary judgment on the issue of liability, which the district court denied.

In his amended complaint, Griggs alleged that DuPont was a fiduciary in relation to the pension plan and had breached its fiduciary duty to Griggs by: (1) "falsely representing to . . . Griggs that his lump sum benefit could be rolled over into a qualified IRA or savings investment plan"; (2) "failing to disclose to Griggs, prior to his retirement, that he would not be able to roll over his lump sum payment into a qualified plan because of the limits imposed by Section 415 of the Internal Revenue Code, notwithstanding DuPont's knowledge that this was the case"; and (3) "generally failing to disclose to . . . Griggs the potential impact of Section 415 limits on his ability to roll over his lump sum distribution." J.A. 52. Griggs sought "appropriate equitable and restitutionary relief, including back pay and loss of benefits which [Griggs] lost by virtue of being induced to elect early retirement, [and] reinstatement to his former position with DuPont." J.A. 52.

The parties agreed there were no issues of material fact requiring a trial and made cross-motions for summary judgment on the issue of DuPont's liability under ERISA. Additionally, DuPont sought summary judgment on the basis that ERISA did not provide the remedies that Griggs was pursuing. The district court agreed with Griggs that DuPont had breached its fiduciary duty; however, the court concluded that ERISA did not provide for any of the remedies sought by Griggs and therefore left him the victim of "a wrong without a remedy." J.A. 291.

Griggs appeals the district court's determination that he is without a remedy for DuPont's breach of fiduciary duty. Alternatively, Griggs contends that if the district court correctly held that ERISA affords him no remedy, then the district court mistakenly concluded that ERISA preempted Griggs's state law claim because preemption is not appropriate when Congress fails to provide relief. DuPont cross-appeals the district court's conclusion that it breached a fiduciary duty under ERISA.

## II.

Although Griggs advances his preemption argument in the alternative, asking us to reach it only if we agree with the district court that Griggs has a viable claim but no remedy, we will address first things

first. Thus, we turn to the issue of whether ERISA preempts Griggs's state law negligent misrepresentation claim, keeping in mind the "'presumption that Congress does not intend to supplant state law.'" *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1467 (4th Cir. 1996) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995)).

ERISA's broadly-phrased preemption clause provides that ERISA's provisions "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C.A. § 1144(a) (West 1999). A state law "'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). In fact, "ERISA pre-empts any state law that refers to or has a connection with covered benefit plans . . . 'even if the law is not specifically designed to affect such plans, or the effect is only indirect.'" *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129 30 (1992) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Of course, "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21. But, as long as the nexus between the state law and the employee benefit plan is not too tangential, "a state law of general application, with only an indirect effect on a pension plan, may nevertheless be considered to 'relate to' that plan for preemption purposes." *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6, 9 (2nd Cir. 1992).

A "state law" includes "all . . . decisions . . . of any State." 29 U.S.C.A. § 1144(c)(1) (West 1999). Thus, in appropriate circumstances, state common law claims fall within the category of state laws subject to ERISA preemption. *See Ingersoll-Rand*, 498 U.S. at 140; *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987). When a cause of action under state law is "premised on" the existence of an employee benefit plan so that "in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists," *Ingersoll-Rand*, 498 U.S. at 140, ERISA preemption will apply. Alternatively, a state law claim is preempted when "it conflicts directly with an ERISA cause of action." *Id.* at 142; *see Powell v. Chesapeake & Potomac Tel. Co. of Va.*, 780 F.2d 419, 422 (4th Cir. 1985) ("To the

extent that ERISA redresses the mishandling of benefits claims or other maladministration of employee benefit plans, it preempts analogous causes of action, whatever their form or label under state law.").

Generally speaking, ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan. *See, e.g.*, *Hall v. Blue Cross/Blue Shield of Alabama*, 134 F.3d 1063, 1064-66 (11th Cir. 1998) (ERISA preempted claim that fraudulent misrepresentations regarding the scope of coverage induced plaintiff to enroll in her employer-provided health benefits plan); *Shea v. Esensten*, 107 F.3d 625, 627-28 (8th Cir. 1997) (preemption applied to a state law claim for "fraudulent nondisclosure and misrepresentation about [the plan's] doctor incentive programs" that "limited [the participant's] ability to make an informed choice about his life-saving health care"); *Smith*, 959 F.2d at 8-10 (ERISA superseded claim that plaintiff was induced to relocate based on his employer's false, oral representations regarding pension benefits). In fact, ERISA preemption is commonly understood to apply to state common law claims that an ERISA fiduciary misrepresented the nature or availability of retirement benefits, or failed to provide enough information to permit the retiring beneficiary to make an intelligent retirement decision. *See, e.g.*, *Muse v. International Bus. Machs. Corp.*, 103 F.3d 490, 493 (6th Cir. 1996) (concluding that ERISA preempts claim that plaintiffs "would have chosen to participate in the superior benefit plan had IBM not negligently or intentionally misrepresented to [them] that no further early retirement plans would be offered"); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir. 1994) (same); *Lee v. E.I. DuPont de Nemours & Co.*, 894 F.2d 755, 756-57 (5th Cir. 1990) (same); *see also Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 791 (1st Cir. 1995) (concluding that "ERISA preempts a state law claim of negligent misrepresentation against an employer based upon the employer's representations regarding the employee's prospective benefits under an early retirement program").

Originally, Griggs sought relief from DuPont in state court based on a theory of negligent misrepresentation. In considering whether ERISA preemption applies to Griggs's claim, however, we look more closely at the factual nature of his claim than any state law label he

applies to that claim. *See Boston Children's Heart Found., Inc. v. Nadal-Ginard*, 73 F.3d 429, 439-40 (1st Cir. 1996) (explaining that a court cannot make a preemption determination solely "based on the form or label of the law . . . . [T]he inquiry into whether a state law 'relates to' an ERISA plan or is merely 'tenuous, remote, or peripheral' requires a court to look at the facts of [a] particular case."). The factual essence of Griggs's claim is that DuPont did not provide any information about the general eligibility limitations on a lump sum rollover of the TPS benefit and then compounded the problem by failing to inform Griggs that federal tax law precluded him from rolling it over into DuPont's SIP, despite DuPont's knowledge of this fact prior to making the TPS distribution. According to Griggs, had he been aware of this limitation, he would not have elected to participate in the TPS program and would have continued working.

This claim has a sufficient "connection with or reference to" DuPont's pension plan to warrant preemption. *Shaw*, 463 U.S. at 97. Griggs contends that the terms of DuPont's written description of TPS benefits misled him about his eligibility to elect various options under the TPS program, and, when DuPont's internal computations revealed that, in fact, Griggs was not eligible for his preferred TPS payment option (and therefore would not be able to defer the taxes on his early retirement benefit), DuPont failed to pass along this information. The assertion concerns a core function performed by an ERISA fiduciary — the provision of information about plan benefits to "permit[ ] beneficiaries to make an informed choice about continued participation." *Varity*, 516 U.S. at 502.

The Ninth Circuit Court of Appeals addressed a remarkably similar set of facts in *Farr II*. There, a group of retired employees brought a claim against their former employer for failing to provide complete information about an early retirement incentive program administered under the company's pension plan. Like DuPont's TPS offer, the program involved in *Farr II* permitted participants to elect a lump sum benefit and explained that "'[a]ll or part of [lump sum] distribution may be rolled over to another qualified plan or an IRA . . . without any current tax liability.'" *Farr II*, 151 F.3d at 911 (second alteration in original). The retirees brought various claims, including fraud and misrepresentation claims, based on the employer's failure to explain that only qualified portions of a lump sum payment would escape

immediate taxation. The court explained that the claims were pre-empted because "the tax consequences of the [early retirement] plan clearly 'relate to' plan administration because they are part of the overall mix of information relied upon by Plaintiffs in making their decisions to participate in the plan." *Id.* at 913.

We conclude that Griggs's negligent misrepresentation claim, which arises under circumstances nearly identical to those in *Farr II*, likewise falls within the expansive scope of ERISA's preemption clause.

### III.

DuPont does not dispute that, as the administrator of its pension plan, DuPont is a fiduciary for purposes of ERISA when it is engaged in the administration or management of its pension plan. *See Barnes v. Lacy*, 927 F.2d 539, 544 (11th Cir. 1991) (fiduciary duty attaches where employer "wear[s] two hats" by acting as both employer and plan administrator); *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1104-05 (6th Cir. 1983) (explaining that ERISA permits an employer to serve as a fiduciary for its employee benefit plan). Neither does DuPont suggest that in conveying information about TPS benefits under its pension plan it was not acting in a fiduciary capacity. *See Varity*, 516 U.S. at 502-03. Rather, DuPont disputes that it violated any obligations imposed upon ERISA fiduciaries.

Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989); *see also Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1299 (3d Cir. 1993) ("Although the statute articulates a number of fiduciary duties, . . . Congress relied upon the common law of trusts to 'define the general scope of [trustees' and other fiduciaries'] authority and responsibil-ity.'" (alteration in original) (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985)). Under common law trust principles, a fiduciary has an unyielding duty of loyalty to the beneficiary. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 152-53 (1985) (Brennan, J., concurring) ("Congress intended by § 404(a) to incorporate the fiduciary standards of trust law into ERISA, and it is black-letter trust

law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits."). Naturally, such a duty of loyalty precludes a fiduciary from making material misrepresentations to the beneficiary. *See Varity*, 516 U.S. at 506; *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983) ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in [29 U.S.C. § 1104]."). However, a fiduciary's responsibility when communicating with the beneficiary encompasses more than merely a duty to refrain from intentionally misleading a beneficiary. ERISA administrators have a fiduciary obligation "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3d Cir. 2000) (internal quotation marks omitted), *cert. denied*, 69 U.S.L.W. 3296 (U.S. Dec. 4, 2000) (No. 00-609).

Moreover, a fiduciary is at times obligated to affirmatively provide information to the beneficiary. Indeed, "[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of America*, 919 F.2d 747, 750 (D.C. Cir. 1990). The common law of trusts identifies two instances where a trustee is under a "duty to inform." First, a fiduciary has "a duty to give beneficiaries upon request 'complete and accurate information as to the nature and amount of the trust property.'" *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir. 1996) (quoting Restatement (Second) of Trusts § 173 (1959)). Second, in limited circumstances, a trustee is required to provide information to the beneficiary even when there has been no specific request:

> Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information . . . . [However,] he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection . . . .

Restatement (Second) of Trusts § 173 cmt. d. In sum, the duty to inform "entails not only a negative duty not to misinform, but also an

affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler*, 12 F.3d at 1300; *accord Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1016 (3d Cir. 1997) (recognizing that "it is clear that circumstances known to the fiduciary can give rise to this affirmative obligation [to inform] even absent a request by the beneficiary" (alteration in original) (internal quotation marks omitted)).

Griggs's claim focuses primarily on a fiduciary's duty to communicate complete and accurate information to a beneficiary and to refrain from misleading the beneficiary with respect to material facts. Griggs contends that DuPont provided him with information that it knew was material to his decision to accept a TPS distribution, and that upon learning later that this important information was false with respect to Griggs individually, DuPont breached its fiduciary duty by failing to notify him of the inaccuracy. Specifically, the assertion is that DuPont provided employees with an explanation of TPS distribution options that clearly implied to them, as it did to Griggs, that a rollover of TPS benefits could be accomplished tax free, that DuPont later learned these rollovers could not be accomplished without the imposition of an immediate tax, and that DuPont did nothing to warn affected employees like Griggs.

We agree with Griggs and the district court that these facts establish a breach of fiduciary duty by DuPont. In so doing, we acknowledge our agreement with DuPont that it did not have "a duty to provide [Griggs] with individualized notice of all the ways the tax laws would impact his lump sum distribution." Brief of Appellee - Cross-Appellant at 14. ERISA does not impose a general duty requiring ERISA fiduciaries to ascertain on an individual basis whether each beneficiary understands the collateral consequences of his or her particular election. *See, e.g.*, *Electro-Mechanical Corp. v. Ogan*, 9 F.3d 445, 452 (6th Cir. 1993) (explaining that "a fiduciary is not obligated to seek out employees to ensure that they understand the plan's provisions"). However, an ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent — especially when that misunderstanding was fostered by the fiduciary's own material representations or omissions. In other words, a fiduciary is obligated to advise the beneficiary "of circumstances that threaten

interests relevant to the [fiduciary] relationship." *Eddy*, 919 F.2d at 750. Thus, for example, "when an ineligible person contributes to a fund, a fiduciary has a duty to inform him of his ineligibility within a reasonable time after the [fiduciary] acquired knowledge of that ineligibility." *Id.* at 751 (alteration in original) (internal quotation marks omitted). In the ERISA context, the recognition of a limited fiduciary duty to inform a beneficiary of material facts in the absence of a specific request for information from the beneficiary is not a ground-breaking proposition. *See Jordan*, 116 F.3d at 1015 (explaining that fiduciary has an affirmative duty to inform a beneficiary of material facts known by the fiduciary but not the beneficiary and that the irrevocability of a retirement benefits election may be a material omission); *Shea*, 107 F.3d at 628-29 (holding that fiduciary breached its duty under ERISA by failing to disclose to the beneficiary financial incentives discouraging preferred doctors from making referrals to specialists — information that was necessary for beneficiary to make an informed decision); *Bixler*, 12 F.3d at 1302-03 (reversing grant of summary judgment to employer on beneficiary's claim that employer breached its fiduciary duty to affirmatively inform beneficiary of COBRA benefits where there was evidence that employer knew beneficiary had unpaid medical expenses that would be reimbursed by an election under COBRA).

Once DuPont learned that Griggs's lump sum rollover election would not be possible and, therefore, that Griggs was no doubt under the mistaken belief that he was eligible to roll "all or part of the lump sum . . . into the DuPont [SIP]" as provided in DuPont's written description, DuPont had a duty to inform him of this development prior to making a fully taxable lump sum distribution. As early as July 1994, before Griggs even applied for TPS benefits, DuPont's employees in the pensions and benefits section learned that at least some portion of Griggs's TPS distribution would not qualify for a rollover. By September 1994, it knew that Griggs would not likely be able to exercise his election to receive a tax-deferred lump sum payment at all. And, DuPont should have known that Griggs was under the impression that he could roll the entire lump sum distribution into a tax-deferred vehicle. Thus, before DuPont distributed the TPS benefit and tax consequences attached, it knew — or should have known — that Griggs expected to receive the benefits of having his TPS benefit paid into a tax-deferred account but that, in fact, he was very much mis-

taken. DuPont should have informed Griggs about this before he retired and before a fully-taxable benefit check was issued to him.

As we earlier alluded, it is critical that Griggs's misunderstanding was fostered by DuPont's TPS explanation. Had DuPont's general, written description of the TPS payment options included a more thorough explanation that federal tax law permits only qualified portions to be rolled over, or that not every employee was eligible for this option, we might view DuPont's duty to inform in a different light. In this case, however, DuPont's pamphlet on TPS benefits included no such explanation and, instead, merely indicated that the beneficiaries *could choose* whether to roll all or part of their lump sum benefit into DuPont's SIP. We are not impressed by the admonishment appearing on the reverse side of the TPS application form (warning applicants to seek tax advice) since it does not explain that an applicant needs to consult a tax expert to determine if he or she is even eligible to make this election.[3] Also, such a warning might have more force if DuPont, during the course of processing Griggs's application, had not learned that Griggs's TPS distribution would not qualify for the tax-deferred SIP. But, once DuPont actually learned that there was a problem that threatened to cut substantially into the benefits Griggs thought he would receive, the particular language on the back of the application form did nothing to correct Griggs's obvious misunderstanding. *Cf. Eddy*, 919 F.2d at 751 ("'A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word.'" (quoting *Globe Woolen Co. v. Utica Gas & Electric Co.*, 121 N.E. 378, 380 (N.Y. 1918) (Cardozo, J.)).

DuPont complains that it would be impractical for it to notify beneficiaries like Griggs, given the vast number of pension plan participants who would potentially elect to participate in TPS or a similar program. We do not perceive any tremendous hardship. DuPont need not have rendered any tax *advice*; rather, it needed only to notify Griggs that, during the processing of Griggs's TPS application, DuPont learned that the tax code may prevent him from taking the

---

[3]We note in passing that even if Griggs somehow knew that his eligibility for a rollover election was an issue and decided that expert advice was necessary, Griggs's own expert could not perform the necessary calculations unless DuPont first supplied the relevant data.

rollover option that he selected.[4] Armed with that information, Griggs could have made a more informed choice about the form of payment that he wished his TPS benefit to take or about whether he would even participate in the TPS program. One wonders how inconvenient carrying out such a duty to inform could be since DuPont had already performed all of the necessary calculations.

In *Farr II* the Ninth Circuit rejected an employer's claim that it satisfied its fiduciary duty to inform when it provided a substantially similar — but even more thorough — written explanation of its early retirement benefit options. In *Farr II*, U.S. West sent a written overview of its early retirement incentives program to employees who were eligible to participate. The overview contained a section entitled "'Tax Considerations Affecting Choice of Distribution'" that identified tax provisions "relevant to the choice between taking the pension benefits in a lump sum or in a series of monthly installments." *Farr II*, 151 F.3d at 911. The overview warned eligible employees that the tax implications of the distribution of benefits were complicated and admonished potential participants to consult with a tax advisor. Finally, the overview explained that part or all of the lump sum payment "'may be rolled over to another qualified plan or an IRA within 60 days without any current tax liability;'" but "[t]he booklet did not say that only qualified portions of the lump sum distributions could be rolled over, and that everything else would be taxed." *Id.*[5] The plaintiffs, long-time employees of U.S. West, decided to participate in the early retirement program, and opted to receive their early retirement benefits in a lump sum. They attempted to roll the lump sum distribution into their individual accounts, only to discover that just qualified portions of their distributions could be rolled over. Thus, the plaintiffs incurred a significant and immediate tax.

---

[4]Or, DuPont could have explained that the TPS rollover option was not automatically available to all employees and that the tax code limited the ability of some highly-compensated employees to enjoy this option.

[5]However, U.S. West provided a telecast to employees addressing the early retirement program. The program indicated that only "a 'qualified portion of the lump-sum distribution' could be rolled over into an IRA," but did not elaborate further. *Farr II*, 151 F.3d at 912.

The plaintiffs contended that U.S. West breached its fiduciary duty pursuant to ERISA § 404 "by providing them with incomplete, false, and misleading information regarding the tax consequences of their lump sum distributions." *Id.* at 912. The *Farr II* panel agreed that U.S. West had breached its fiduciary duty by failing "to provide sufficiently detailed information" to put the plaintiffs on notice of the potentially adverse tax consequences and, generally speaking, who might be affected. *See id.* at 915. The court concluded that U.S. West

> should have explained to employees the difference between excess lump sum benefits that cannot be "rolled over" into IRAs and are therefore subject to immediate taxation and qualified benefits which can be "rolled over" without immediate taxation. [U.S. West's] fiduciary duties also required [it] to explain more specifically what categories of employees would be likely to be affected by the § 415 limitations, such as employees expecting larger amounts of financial benefits. With this information, individual employees would be alerted that they themselves might face adverse tax consequences and could make informed decisions about whether they needed to seek professional tax advice.

*Id.*[6] The *Farr II* court made clear, however, that U.S. West's duty to inform did not extend to "individualized notice of all the ways the tax laws would impact each of [the plaintiffs'] individual distributions." *Id.*

DuPont has tried to frame the issue as whether it had a duty to give, on its own initiative, individualized notice to Griggs of all of the potential tax *consequences* of his election — an idea that *Farr II* rejected. As previously stated, we view the issue differently. Griggs decided to retire early because he believed he could receive a substantial lump-sum benefit that, according to DuPont's written description, could be rolled over into his SIP account on a tax-deferred basis, and

---

[6]Ultimately, the court determined that ERISA did not provide a remedy for the wrong suffered by the plaintiffs; however, the court declined to expressly address whether reinstatement — the remedy that Griggs seeks — is an available remedy under ERISA. *See Farr II*, 151 F.3d at 916.

Griggs so opted. However, DuPont determined that, because of the limitations imposed by section 415, Griggs was not eligible for the option he selected. Thus, the question is whether DuPont had a fiduciary obligation to pass this information along to Griggs before it simply distributed the money and Griggs incurred tax liability that he had opted to avoid. We answer that question affirmatively, and conclude that DuPont failed to discharge that duty.

IV.

Finally, we address the district court's conclusion that, despite DuPont's breach of duty, Congress provided no remedy under ERISA. Originally, Griggs sought a number of various remedies; however, Griggs has now whittled down his claim to a single remedy. He wishes to be returned — to be "reinstated" — to the pre-election position he occupied prior to September 1994. Observing that reinstatement "would require Griggs to return the TPS payment he received, as well as any profit thereon which would have enured to the Plan had Griggs not accepted the early retirement package," the district court concluded that "'reinstatement' and return of the parties to the pre-September, 1994, *status quo* is not feasible." J.A. 293.

Griggs seeks relief under ERISA § 502(a)(3) which provides: "A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other *appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C.A. § 1132(a)(3) (emphasis added). By this provision, Congress provided individual beneficiaries with an avenue to seek equitable relief for a breach of fiduciary duty under ERISA. *See Varity*, 516 U.S. at 507-15. The trick comes in determining what qualifies as "appropriate equitable relief."

The phrase "appropriate equitable relief" encompasses "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993). In considering what kind of remedies would typically be categorized as equitable in nature, the Supreme Court looked to "virtually identical language in

Title VII of the Civil Rights Act of 1964 . . . where the phrase 'any other equitable relief as the court deems appropriate' was held to limit recovery to back pay, injunctions and other equitable remedies and not to allow 'awards for compensatory or punitive damages.'" *Hemelt v. United States*, 122 F.3d 204, 207 (4th Cir. 1997); *see Mertens*, 508 U.S. at 255. The question, then, is whether the remedy Griggs seeks — reinstatement to the status quo — is a kind typically available in equity. We believe it is.

Contrary to DuPont's suggestion, *Varity* provides guidance — albeit general — on this issue. In *Varity*, a group of individual plaintiffs sought relief under section 502(a)(3) after they were defrauded by the parent company of their employer into leaving their employment, relinquishing their medical and nonpension benefits, and transferring to another subsidiary that turned up insolvent and unable to make good on its benefit plan. The plaintiffs argued that if not for the breach of fiduciary duty, they would not have left their original employer and would have been receiving benefits under its plan. *See Howe v. Varity Corp.*, 36 F.3d 746, 754-55 (8th Cir. 1994). The Eighth Circuit Court of Appeals determined that section 502(a)(3) entitled the plaintiffs "to an injunction reinstating them as members of [their original employer's] Welfare Benefits Plan under the terms of that plan as it existed at the time of retirement," *id.* at 756, a conclusion that the Supreme Court affirmed, *see Varity*, 516 U.S. at 515.

Moreover, reinstatement is clearly among the forms of "other equitable relief" permitted under Title VII, *see* 42 U.S.C.A. § 2000e-5(g) (providing that a court that determines that an employer has violated Title VII may "order such affirmative action as may be appropriate" including "reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate"). We are aware of the significant problems that would result from drawing analogies between ERISA and Title VII; however, for the limited purpose of deciding what constitutes "appropriate equitable relief" under ERISA, we are satisfied that the use of nearly identical language in Title VII sheds light on the subject. *See Mertens*, 508 U.S. at 255; *Hemelt*, 122 F.3d at 207-08. We believe that reinstatement, as a general equitable concept, is within the range of redress permitted by the phrase "other appropriate equitable relief."

However, even if the redress sought by a beneficiary under ERISA § 502(a)(3) is a classic form of equitable relief, it must be *appropriate* under the circumstances. For example, such relief is not "appropriate" equitable relief "where Congress elsewhere provided adequate relief for a beneficiary's injury" and there is "no need for further equitable relief." *Varity*, 516 U.S. at 515.[7] Or, for instance, reinstatement might not be appropriate equitable relief within the Title VII context where circumstances have changed substantially such that reinstatement would require removing an current employee. *Cf. Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 121 (4th Cir. 1983) (explaining that district court's authority to fashion equitable relief under the ADEA "does not . . . extend to ordering the displacement or bumping of incumbent employees.").

The district court held that ERISA provided no equitable relief for Griggs based on the conclusion that the "return" and "reinstatement" of the parties to their pre-election positions was "not a viable alternative." J.A. 293. The court, however, did not specifically explain why the reinstatement or return of the parties was not a viable option and why reinstatement would not be "appropriate" equitable relief under ERISA § 502(a)(3), other than to point out that if Griggs were reinstated he would be required to return his TPS benefit. Moreover, it is not apparent from the record whether the district court was addressing reinstatement to Griggs's position of employment, reinstatement under the plan such that Griggs could make another TPS distribution option, or both. We understand Griggs's claim to encompass both possibilities.

We are not convinced that Griggs is simply without an equitable remedy under ERISA. Although we agree that there may well be facts

---

[7]Of course, in this case Griggs's breach of fiduciary duty claim is remedied under section 502(a)(3), or it is not remedied at all. Griggs cannot recover "benefits due" under section 502(a)(1), *see* 29 U.S.C.A. § 1132(a)(1), because when he received his lump sum payment, he received all that he was entitled to receive from DuPont — there are no outstanding benefits. And, Griggs cannot recover under subsection (a)(2), *see* 29 U.S.C.A. § 1132(a)(2), because that provision does not provide remedies for individual ERISA beneficiaries. *See Russell*, 473 U.S. at 144.

that make the return of the parties to their pre-election positions inappropriate, we are not able to determine why the district court found such relief to be inappropriate, and, on this record, we are not able to make the determination in the first instance.

Thus, we remand for further factual development with respect to whether the reinstatement of the parties to the pre-election status quo is appropriate. In determining whether such relief is appropriate, the district court's consideration should be broader than the question of whether it would be appropriate, or even possible at this point, to reinstate Griggs to his job. The district court should also consider whether it would be appropriate, or even possible, to return Griggs to his pre-election position so that he could make an alternate TPS distribution election. In either event, we note that because reinstatement is equitable in nature, Griggs is not entitled to a windfall; if he is reinstated, we agree with the district court that he must return his TPS benefit. Indeed, Griggs concedes that he would be required to return at least part of his TPS distribution. We will leave it to the sound discretion of the district court to consider the subtleties that will surely arise, including what portion of Griggs's benefit he must return if equitable relief is appropriate, *i.e.*, on whom the loss occasioned by the tax liability should fall.

V.

In sum, we conclude that the district court properly determined that Griggs's negligent misrepresentation claim is preempted by ERISA. We likewise affirm the district court's determination that DuPont breached its fiduciary duty to Griggs under ERISA. However, we conclude that the return or reinstatement of the parties to their pre-election positions is not necessarily an inappropriate remedy under these circumstances, and we remand for the district court to further develop this issue.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*