394 F.3d 213
 Paul L. PHELPS; Jerry H. Gilstrap; Jerry W. Cuddy; Gerald W. Lyda; Nina Posey; Thomas R. Williams; Alvin A. Stiwinter; Troy J. Cottrell; Thomas L. Carlson; Robert W. Carter; Wayne F. McWhorter; Rodney K. Deanhardt, Sr.; Melvin M. Brock; Edward J. Cooley; Charles A. Furr; Francis C. Aiken; Elizabeth Audrey
Loredo; Jimmy S. Staton; Norman Davis; Eugene M. Krenek; Richard N. Ryder, II; Katherine D. Lackey, Plaintiffs-Appellants,
v.
C.T. ENTERPRISES, INCORPORATED; Saco Lowell, Incorporated, Defendants-Appellees, and
Cliff Theisen; Tom Pomian; Mike Templeton; Branch Banking And Trust Of South Carolina, Defendants.
 No. 04-1198.
 United States Court of Appeals, Fourth Circuit.
 Argued: September 28, 2004.
 Decided: January 12, 2005.
 
 1
 ARGUED: John Robert Peace, Greenville, South Carolina, for Appellants. Vance Earle Drawdy, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Greenville, South Carolina, for Appellees. ON BRIEF: Brian D. Black, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Greenville, South Carolina, for Appellees.
 
 
 2
 Before WILKINSON and WILLIAMS, Circuit Judges, and Roger W. TITUS, United States District Judge for the District of Maryland, sitting by designation.
 
 
 3
 Vacated and remanded for further proceedings by published opinion. Judge TITUS wrote the opinion, in which Judge WILKINSON and Judge WILLIAMS joined.
 
 OPINION
 TITUS, District Judge:
 
 4
 On November 5, 2002, Paul L. Phelps and twenty-one other individuals (the "Employees") filed a complaint in the United States District Court for the District of South Carolina, Greenville Division, against Cliff Theisen ("Theisen"), C.T. Enterprises, Inc. ("C.T."), Saco Lowell, Inc. ("Saco Lowell"), Tom Pomian ("Pomian"), Mike Templeton ("Templeton"), and Branch Banking and Trust of South Carolina ("BB & T"), alleging causes of action for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) breach of fiduciary duty pursuant to 29 U.S.C. § 1104, money damages for unpaid wages, compensation and other amounts due and owing, conspiracy to misappropriate funds, and for declaratory relief against BB & T. It does not appear that BB & T was ever served, and the Employees later filed a Notice of Voluntary Dismissal as to that defendant. From an order of the District Court granting summary judgment in favor of all remaining defendants, the Employees appeal. For the reasons set forth below, we vacate and remand the case for further proceedings.
 
 I.
 
 5
 Effective April 5, 1999, Saco Lowell, an employer which then manufactured equipment used in the textile industry, established for its employees the Saco Lowell, Inc., Group Health Benefits Plan ("the Plan".) Saco Lowell, in addition to being employer of the Employees, was the Plan Sponsor and the Plan Administrator. Funding for the Plan was derived from a combination of funds of Saco Lowell and contributions made by the Employees.[1] Payment of benefits under the Plan was to be made through the Claims Administrator, Kanawha Benefits Solutions, Inc., a subsidiary of Kanawha HealthCare Solutions, Inc. ("Kanawha").
 
 
 6
 Effective July 1, 2000, the Plan was amended so as to substitute C.T. as the Employer and the Plan Administrator.[2] The 2000 amendment stated that the sources of contributions funding benefits under the plan were "C.T. Enterprises, Inc. and its employees." Beginning on or about the same date, it is not disputed that C.T. did not provide Kanawha with sufficient funds to pay in a timely manner all outstanding claims alleged to be due under the terms of the Plan. Between July 24, 2000 and December 5, 2000, C.T. failed to pay for a total of $286,004.18 in medical plan claims invoiced by Kanawha. Of this amount, the employees in this case experienced unpaid medical and dental claims in the amount of $125,343.77.[3]
 
 
 7
 On November 21 2000, C.T. terminated the Plan effective November 28, 2000. In deposition testimony, Templeton — Saco Lowell's comptroller who was also an officer of C.T. — described how the Plan became insolvent:
 
 
 8
 Then [in July, 2000] we had, about the same time that the bank told us that they weren't going to continue to fund us and we ran out of money for payroll, we had a week that hit that was about seventy four thousand, seventy five thousand dollars [in Medical Plan claims]. So that kind of threw everything out of kilter right there. It was just one big one we had, I think, three employees or spouses or something had like heart attacks and strokes all within one short period of time and all the bills hit at once and at that time Kanawha did not want us to pay partial. They wanted the whole thing or nothing and that ... we didn't have seventy four thousand dollars at all. I mean, the company did not have it, the bank was not advancing, and that's when everything really fell apart on the health plan ... That was July, mid-July.
 
 
 9
 (J.A. 66, Line 17 — J.A. 67, line 7). Templeton went on to testify that C.T. had been forced to choose between funding the Plan or the company's payroll from mid-July 2000 until the Plan was terminated in November 2000. In this regard, he testified as follows:
 
 
 10
 Q. At that point [in mid-July], at that point that there was seventy four thousand [in medical claims due] and you didn't have seventy four thousand, at that point you're prioritizing debts. Who made the decision not to divert money in to pay those health claims but to divert to pay other things? Whose decision was that?
 
 
 11
 A. I guess it would have been Cliff's [Theisen] ultimately. I'm not sure that a conscious decision was made to do that. Like I said, at that time Kanawha only wanted the whole payment. They did not want to go in it and pull out, you know, we'll pay you half of it this week, half of it next week, and you release half the checks and half the checks. They didn't want to do that. So it came down to paying payroll or paying the health claims.
 
 
 12
 (J.A. 67, lines 8-21).
 
 
 13
 The financial condition of Saco Lowell and C.T. in the first half of 2000 was generally known to be poor. Employees were also aware that the companies' financial problems persisted as the year progressed. During the second half of 2000, Saco Lowell management met with Employees at least once to inform them, in general terms, of the Plan's financial problems. At this meeting, and in other informal conversations with individual Employees, Theisen assured the workers that "we're doing everything we could" to pay the outstanding claims. (J.A. 69, lines 7-12.) Nonetheless, the record reveals no instance in which the Employees were ever specifically informed that the Plan Administrator and Employer had all but ceased to transfer its required contributions to Kanawha.
 
 
 14
 In November 2000, the month in which the Plan was terminated, Theisen told the Employees at a meeting that "we didn't have the money to pay them, that everybody was on temporary layoff for the next week and that we would call them and let them know when checks would be ready and everything." (J.A. 72, lines 12-16). With regard to payment of claims under the Plan, Templeton stated that he recalled "questions about the health care which Cliff said that we were doing everything we could do to get paid." (J.A. 72, lines 18-20).
 
 
 15
 On November 7, 2000, Kanawha advised the Employees that it had processed claims incurred by the Employees or their dependents in good faith, and had repeatedly requested funding for these claims from C.T., but that its requests have gone unanswered. Therefore, Kanawha advised the Employees, "we are notifying you of C.T. Enterprises, Inc. Group Health Benefits Plan's failure to provide funds to allow us to release payment of these claims." (J.A. 47).
 
 
 16
 When notice was given to the Employees on November 21, 2000 of termination of the Plan, the Employees were only told that "any and all charges incurred after the Effective Date [November 28, 2000] for services provided or other costs or expenses incurred after the Effective Date, will not be covered by the Plan." (J.A. 48). No mention was made of the status of costs or expenses incurred prior to the effective date nor the status of the monetary contributions required of the Employer and Plan Administrator under the Plan document.
 
 II.
 
 17
 In the proceedings below, Theisen, Templeton, Pomian, C.T. and Saco Lowell moved for summary judgment arguing, inter alia, that they were not fiduciaries, but if they were, they did not breach any fiduciary duties. The District Court, "without deciding whether the Defendants were fiduciaries and/or acted at some time in a fiduciary capacity," concluded that there was no breach of any fiduciary duty. The District Court rejected the argument of the Employees that there was a duty to fund the Plan so as to pay claims of participants and beneficiaries, and agreed with the Defendants that funding the Plan is a "business, not fiduciary, function." (J.A. 287). As such, the District Court concluded that "any failure to fund the Plan is not a breach of fiduciary duty in this case." Id.
 
 
 18
 Responding to an argument of the Employees that the Plan assets had been co-mingled in a general business account rather than being held in trust, and that such conduct was a breach of fiduciary duty, the District Court concluded that
 
 
 19
 "[t]o the extent such co-mingling is a breach of fiduciary duty, the Court finds that the plaintiffs were not injured because the amount paid out in claims by the Plan far exceeds the total amount of employee contributions. In fact, employer contributions of Nine Hundred Twenty-Eight Thousand Dollars ($928,000.00) were made to the Plan in excess of the employee contributions." (J.A. 288).
 
 
 20
 The District Court rejected an argument by the Employees that Theisen, Templeton, Pomian, C.T. and Saco Lowell had breached a fiduciary duty by failing to provide complete and accurate information to the Plan beneficiaries regarding the financial status of the Plan. The District Court noted that in Griggs v. E.I. DuPont De Nemours & Co., 237 F.3d 371 (4th Cir.2001), this Court had "addressed the issue of an affirmative duty to provide information to a beneficiary." However, the District Court found that "that case is easily distinguishable from the facts before the Court." (J.A. 288). Finally, the District Court addressed the argument by the Employees that "29 U.S.C. § 1021 imposed such a duty," and found "this argument without merit." Id. No explanation was given by the District Court for either of these last two conclusions. From the final judgment entered against them on January 12, 2004, the Employees appealed to this Court.
 
 III.
 
 21
 This Court reviews a grant of summary judgment de novo and applies the same standard as the District Court. The propriety of importing the summary judgment standard whole-cloth into the ERISA context has already received extensive attention from a sister circuit. See Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 617 (6th Cir.1998). Though we share the reservations that the Sixth Circuit articulates, see Berry v. Ciba-Geigy, 761 F.2d 1003, 1007 (4th Cir.1985), we note, as it does, that such perplexities arise chiefly when courts are reviewing claims for benefits under 29 U.S.C. § 1132(a)(1)(B). Appellants press no such claims here. We therefore examine their appeal under the normal summary judgment standard and its attendant caselaw. See Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1069 (11th Cir.2004); Bixler v. Central Penn. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1297-98 (3d Cir.1993).
 
 IV.
 
 22
 In 1974, Congress passed the Employee Retirement Income Security Act, commonly known as ERISA. (Pub.L. No. 93-406, 88 Stat. 829, codified at 29 U.S.C. § 1001 et seq. (2003)). A primary purpose of the Act is to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.
 
 
 23
 29 U.S.C. § 1001(b).
 
 
 24
 Some of the basic standards for any employee benefit plan are that it must be "established and maintained pursuant to a written instrument" which "shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). Section 1103(c)(1) provides that the "assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."
 
 
 25
 For purposes of ERISA, Congress provided that
 
 
 26
 a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 27
 29 U.S.C. § 1002(21)(A).
 
 
 28
 In Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir.1992), cert. denied 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993), this Court emphasized that fiduciary duty under ERISA is not an all-or-nothing concept: that is,
 
 
 29
 the inclusion of the phrase "to the extent" in § 1002(21)(A) means that a party is a fiduciary only as to the activities which bring the person within the definition. The statutory language plainly indicates that the fiduciary function is not an indivisible one. In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue.
 
 
 30
 (citations omitted).
 
 
 31
 In determining whether a person is a fiduciary with respect to the particular activity at issue, a court is required to examine the relevant documents to determine whether the conduct at issue was within the formal allocation of responsibilities under the plan documents and, if not, ascertain whether, in fact, a party voluntarily assumed such responsibility for the conduct at issue. Id.
 
 
 32
 Where, for example, an employer is entrusted with employee funds for remittance to a claims administrator, along with any employer contributions, the employer is acting in a fiduciary capacity under ERISA. Broadnax Mills, Inc. v. Blue Cross & Blue Shield of Virginia, 867 F.Supp. 398, 405 (E.D.Va.1994).
 
 
 33
 In their brief, Saco Lowell and C.T. state that the "undisputed evidence below was that all of the employee contributions to the Medical Plan were indeed transferred to the Plan's Claims Administrator, and used to fund claims and reasonable costs of administration." (Appellee Br. at 16). As support for this statement, they point to an affidavit by Theisen, C.T.'s CEO, in which he states as follows:
 
 
 34
 From the inception of the Medical Plan, the amounts withheld from Saco Lowell employees' pay for contributions to the Medical Plan were never enough to fund the claims and administrative expenses of the Medical Plan. To illustrate this point, from the date the Medical Plan was established until the time the Medical Plan was terminated, Saco Lowell made employer contributions to the Medical Plan (to pay for claims and administrative expenses of the plan) that were approximately $928,000.00 over and above the employee contributions.
 
 
 35
 (J.A. 104-5). This statement by Theisen may be correct in that the company may have made contributions during the life of the plan that exceeded Employee contributions by $928,000.00, but it does not support the proposition that all deductions from Employee paychecks were remitted to Kanawha, the Claims Administrator. The record evidence strongly indicates otherwise.
 
 
 36
 For example, Templeton, C.T.'s Controller, testified that the deductions were a "fictional transaction," that "no money was actually moved from one account to another," and the funds were "never sequestered" and "never really distinguished from the company account." (J.A. 128). After July 24, 2000, until shortly after termination of the Plan, only seven payments were made to Kanawha, all of relatively small amounts, so that the accrued liability for unpaid medical claims reached $286,004.18 by December 5, 2000. (J.A. 282).
 
 
 37
 Although Employees were paid weekly and deductions for the medical plan withheld from their paychecks, the amounts remitted to Kanawha were not at weekly intervals, were not consistent in amount, and, other than a small ($443.58) check issued to Kanawha on November 13, there were no payments to it after October 4, 2000. Id. At the same time, C.T. was presumably withholding from the paychecks of its Employees amounts intended by them to fund the Plan on whose benefits they were relying. While the record is unclear as to the number of Employees, if there were only fifty contributing at the rate of $17.00 per week, there would have been a liability to the Plan of at least $850.00 per week. Based on the limited record before us, it is thus very difficult to view as "undisputed" the fact that C.T. transferred to Kanawha "all sums" withheld from its Employees for the Plan from July through its termination in November of 2000.
 
 
 38
 In a case with significant similarities to the instant case, the Eastern District of New York concluded that a financially distressed employer had the fiduciary responsibility to make contributions due to a plan, and that ERISA made no exceptions based on the financial condition of the plan sponsor. Pension Benefit Guar. Corp. v. Solmsen, 671 F.Supp. 938 (E.D.N.Y.1987). There, where an employer had "allocated available monies to pay other company expenses rather than the Plan contributions deducted from employee paychecks," the employer was directed to "answer in damages for the consequences." Id. at 945.[4]
 
 
 39
 For the foregoing reasons, it is evident that the district court misapprehended the nature of the legal theory informing Employees' allegation that appellees violated ERISA by failing to fund the plan. The malfeasance of which appellants complained below, and which they reiterate on this appeal, was the particular failure to remit their paycheck deductions to Kanawha as much as any general neglect to fund the Plan in full. The District Court's vague statement that funding the Plan is a "business, not fiduciary, function" reveals an incomplete understanding of the precise nature of the legal theory under which Employees are proceeding.
 
 
 40
 Appellants also allege that the district court erred in holding that they had no claim for breach of fiduciary duty based on appellees' failure to inform them in sufficient detail about the Plan's financial predicament in the second half of 2000. This circuit has already carefully outlined the general conditions under which an ERISA fiduciary has a duty to refrain from misleading interactions with beneficiaries and those occasions on which a fiduciary has an affirmative duty to disclose information to such beneficiaries. See Griggs, 237 F.3d at 380. The district court was aware of these standards when it dismissed this claim for breach of fiduciary duty. (See J.A. 288). As we have demonstrated, however, the lower court misapprehended the legal theory on which Employees based their other claim for breach of fiduciary duty. After proper consideration of that theory, namely that the Employer failed to remit the Employees' own paycheck contributions to the Claims Administrator, the district court may find that a different resolution of the incomplete disclosure allegation, grounded in Griggs, is appropriate on these facts. Given the district court's legal error on the first theory of liability, and considering the close relationship between the factual predicates supporting that theory and those underlying the Griggs claim, we think it best to remand the case so that the district court may have the opportunity to further develop the evidence in a manner consistent with a proper interpretation of the law. See United States v. Booze, 293 F.3d 516, 519 (D.C.Cir.2002); Kurdziel v. Pittsburgh Tube Co., 416 F.2d 882, 886 (6th Cir.1969).
 
 V.
 
 41
 Viewing the facts in the record and the reasonable inferences in the light most favorable to the Employees, we conclude that a reasonable fact finder could find that C.T., and Theisen, Pomian and Templeton, the officers of C.T. who directed actions on its behalf, were fiduciaries under ERISA when, as representatives of the Employer and Plan Administrator, they directed that the Employees' own paycheck contributions, which were then due for payment by the Claims Administrator (Kanawha) to third parties under the provisions of the Plan, be diverted instead for other purposes. Under the terms of the Plan documents, C.T. Enterprises, Inc., was identified as both the Plan Sponsor and Plan Administrator. As such, C.T., the corporate entity, was expressly made a fiduciary for administration of the assets of the Plan, which consisted of both corporate and employee contributions. In addition, it is not disputed that Theisen, Pomian and Templeton acting, respectively, as C.T.'s CEO, President and Controller, made the decision to pay other corporate expenses of C.T., rather than to remit the Employees' own paycheck deductions to the Plan. Because they voluntarily assumed the responsibility of a fiduciary, they become subject to the obligations of a fiduciary under ERISA. In such circumstances, a renewed examination by the District Court of both Employees' claims for breach of fiduciary duty is appropriate. Accordingly, it was error for the District Court to grant summary judgment against the Employees, and the judgment must be vacated and remanded for further proceedings.
 
 VI.
 
 42
 In closing, we draw the District Court's attention to precedent interpreting the statutory provisions under which Employees have grounded their claims. These cases govern the nature of the proceedings on remand.
 
 
 43
 In Berry v. Ciba-Geigy, 761 F.2d 1003 (4th Cir.1985), this court considered whether a claimant under ERISA could insist upon a jury trial. We decided that congressional silence on this issue in the text of the statute "returned [the question] to the common law of trusts." Id. at 1007. Under such law, "proceedings to determine rights under employee benefit plans are equitable in character and thus a matter for a judge, not a jury." Id. Putting such issues to the jury, we held, would erode the deference to the ERISA administrator that the Act's "abuse of discretion" standard required. Id.
 
 
 44
 Berry involved a claim for benefits under 29 U.S.C. § 1132(a)(1)(B). Thomas v. Oregon Fruit Prods. Co., 228 F.3d 991, 997 (9th Cir.2000), likewise references other circuit cases holding that no jury trial right attaches to actions under this statutory provision. Employees' claim for benefits under § 1132(a)(1)(B) was dismissed by the District Court because the claimants had not exhausted their administrative remedies and had not named the Plan as a defendant. This aspect of the District Court's ruling was not challenged on appeal.
 
 
 45
 Any potential relief available to the Employees going forward must therefore be grounded in the "other equitable relief" language of 29 U.S.C. § 1132(a)(3).[5] Providing, as it does, for only equitable remedies, this section of ERISA likewise entails no right to jury trial. See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 883 (6th Cir.1997); Harsch v. Eisenberg, 956 F.2d 651, 654 n. 4 (7th Cir.1992); Cox v. Keystone Carbon Co., 861 F.2d 390, 393 (3d Cir.1988). Further proceedings in this case must therefore occur before the district court.
 
 
 46
 
 VACATED AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 
 Notes:
 
 
 [1]
 The contributions by the Employees were made by payroll deductions. Contributions were $1.00, $17.00, or $21.00 per week, depending on the level of coverage
 
 
 [2]
 The change apparently was the result of C.T.'s acquisition of Saco Lowell's assets. Saco Lowell is described in the amendment as a subsidiary of C.T
 
 
 [3]
 The employees in the instant case are the second group to file suit arising out of unpaid medical and dental claims under the Plan. In the earlier case,Clarey, et al. v. Theisen, et al., No. 6:01-224-20, the United States District Court for the District of South Carolina denied the Defendants' Motion for Summary Judgment, after which the case was settled.
 
 
 [4]
 After the decision inSolmsen, The Department of Labor issued a regulation that expressly provided that employee contributions are plan assets. See 29 C.F.R. § 2510.3-102 (2004). This regulation further strengthens the notion that a breach of fiduciary duty occurred when the Plan Administrator and Employer neglected to transfer to Kanawha the deductions from Employees' paychecks.
 
 
 [5]
 The parties have disagreed with respect to the remedies available under this provision of ERISA for those in the Employees' situation. The question of a remedy must be decided in the first instance by the District Court on remand in the event that liability attaches under the principles we have set forth hereinSee Griggs v. E.I. DuPont de Nemours & Co., 385 F.3d 440 (4th Cir.2004); Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371 (4th Cir.2001).