DANIEL A. HEGARTY,

*vs.*

AMERICAN COMMONWEALTHS POWER CORPORATION, a corporation created by and existing under the laws of the State of Delaware.

In the Matter of the Petition of American Gas & Power Company to Establish Trust Upon Certain Assets in Possession of Receivers.

*New Castle, Nov. 2, 1932.*

*Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, and *Oscar R. Ewing,* of the firm of Hughes, Schurman & Dwight, of New York City, for petitioner.

*Clarence A. Southerland,* of the firm of Ward & Gray, and *A. C. Smith,* of New York City, for receivers.

THE CHANCELLOR: Facts are shown from which I conclude that at the time of the transactions hereinafter referred to, the respondent, the Power Company, which is now in receivership, controlled and dominated the Gas Company, the petitioner. Sundry intercorporate relations of creditor and debtor had been created prior to March 25, 1931, between these companies, and also between the respondent and others, certain of which were subsidiaries of the petitioner.

The stipulation of facts shows that as of March 31, 1931, the following transactions were put through by the petitioner and the respondent:

1. Petitioner
   (a) Was allowed by respondent an application of dividends due petitioner on stock of Minneapolis Gas Light Co. owned by petitioner to indebtedness of petitioner to respondent, said dividends amounting to ............................. $ 88,000.00
   (b) Sold to respondent $1,065,000 principal amount of petitioner's secured Gold Debentures, 6% series, at approximately 80 for the sum of...... 852,000.00
   (c) Sold to respondent $721,000 principal amount of 5% First Mortgage Bonds of Jacksonville Gas Co., at 75 and accrued interest, for the sum of.. 552,766.18
   (d) Assumed a debt of respondent to American Commonwealths Power Associates, a Massachusetts Trust, in the sum of........................ 123,851.64

| | | |
|---|---|---|
| (e) | Assumed a debt of respondent to Minneapolis Gas Light Co. in the sum of.................. | 2,143,670.94 |
| (f) | Assumed a debt of respondent to Vermont Lighting Corporation in the sum of................ | 7,000.00 |
| | | $3,767,338.76 |

2. And respondent against the foregoing

| | | |
|---|---|---|
| (a) | Credited the petitioner the amount owed by it to respondent in the sum of.................. | $1,226,425.13 |
| (b) | Credited petitioner with accrued interest due on the foregoing indebtedness in the amount of.... | 3,429.12 |
| (c) | Transferred to petitioner and petitioner accepted for cancellation 24,000 shares of petitioner's Preference stock at $100 per share and accrued dividends from February 15, 1931, to March 1, 1931, in the sum of.......................... | 2,418,000.00 |
| (d) | Paid to petitioner in cash..................... | 119,484.51 |
| | | $3,767,338.76 |

What resolutions were adopted by which the foregoing transactions were authorized appear to have been adopted by the petitioner. The respondent controlled, as it had named, the directors of the petitioner, and as a matter of fact carried out all the things provided for in the petitioner's resolutions on its part to be done. Notwithstanding there was no formal contract executed by petitioner and respondent, yet it appears to me that the foregoing statement, which is put in the form of a rough debit and credit account, evidences a contract whereby certain existing indebtedness of petitioner to respondent was satisfied by the respondent, indebtedness of the respondent to others was assumed by petitioner, and at the same time a new transaction involving the purchase by respondent from petitioner of a block of the latter's gold debentures and $721,000 of Jacksonville Gas bonds, was entered into. This new transaction was, for purposes of settlement, blended with theretofore existing ones, and all, both old and new, were adjusted as a whole. Petitioner obtained a cancellation of its indebtedness to respondent and 24,000

shares of its own preference stock at $100 and $119,484.51 in cash; and respondent in exchange acquired from petitioner the debentures and Jacksonville Gas bonds, and an assumption by petitioner of certain liabilities owed by respondent to others.

The present controversy has to do with the alleged over-valuation placed on the 24,000 shares of petitioner's preference stock which respondent surrendered to petitioner for cancellation. It is claimed by the petitioner that a valuation of that stock at $100 per share was a grossly exaggerated one, that at the best it was not fairly worth more than $65 per share and that therefore the respondent fraudulently used its power over the petitioner to cause it to agree in substance to pay $35 per share too much for the stock, whereby it became damaged in the total of $840,-000. The theory upon which the petitioner is proceeding is that it can follow the Jacksonville Gas bonds and the petitioner's debentures, or their proceeds, in the hands of the receivers of the respondent as being impressed with a trust because of the alleged fraud so perpetrated by the respondent.

When the transactions involved in the foregoing statement had been completed, as they were in due course, the respondent was in possession of $1,065,000 of the petitioner's debentures and $721,000 of the Jacksonville Gas bonds, formerly held and owned by the petitioner. The respondent became indebted to U. S. and International Securities Corporation in the principal sum of $2,963,598.77 evidenced by a note in that amount. The note was secured by collateral. The collateral was composed not only of securities and stock which the respondent acquired otherwise than from the petitioner, but also of the $1,065,000 of petitioner's debentures and the $721,000 of Jacksonville Gas bonds, which the respondent had acquired from the petitioner in the manner above described.

The note was reduced to $1,192,598.77 and after re-

ceivers were appointed for the respondent, the holder of the note gave notice that because of default in the payment of the balance due thereon the collateral would be sold on January 18, 1932.

Thereupon the receivers, by order of this court, entered into an arrangement with A. E. Fitkin, the details of which need not be stated, whereby Fitkin paid the note. In order to raise the cash necessary for Fitkin to pay the note, he sold with the consent of the receivers the petitioner's debentures which were a part of the collateral for $335,-287.16. As a result of the arrangement with Fitkin the receivers received into their possession that portion of the released collateral which the respondent had acquired otherwise than from the petitioner, as well as some of the Jacksonville Gas bonds before mentioned. They now hold most of the collateral so released.

It is the contention of the petitioner that, as the debentures which the respondent acquired from the petitioner under the allegedly fraudulent circumstances above shown supplied a portion of the cash which, through payment of the note, went to the acquisition by the receivers of the released collateral just referred to, and as, it is contended, the petitioner is entitled to rescind the contract as having been procured by fraud, it, the petitioner, has the right to impress a trust on the proceeds yielded by the sale of the debentures, said proceeds now being in the form of collateral released to the receivers upon payment of the note by Fitkin. Of course such of the Jacksonville Gas bonds as were obtained from the petitioner and were deposited in the collateral and subsequently released, are differently circumstanced from the other collateral, for as to them there is no occasion to resort to the doctrine of following trust proceeds into their converted form, as the petitioner seeks to do with respect to the other released collateral. As to the Jacksonville Gas bonds, therefore, the petitioner claims that all of them which were obtained from it are

reclaimable by it as being precise property which was obtained by the alleged fraud and is upon rescission, recoverable in specie. As to such bonds, there is no occasion for the petitioner to resort to the doctrine of following trust assets in their converted form.

Putting petitioner's contention in another way, it is that inasmuch as the respondent fraudulently caused it to pay $840,000 too much for the 24,000 shares of its preference stock, and as a result of such fraud secured from it its debentures and Jacksonville Gas bonds, the petitioner is entitled not only to be repaid the damage done to it in that amount, but as well to follow everything obtained from it as a result of the alleged fraud which is now in the hands of the receivers, whether in the original or converted form, and have it impressed with a trust in its favor superior to the rights of all other creditors.

This contention is in the last analysis based on the equitable right of the petitioner to treat the contract of March 31, 1931, as rescinded. That is what it amounts to. Yet the petitioner does not ask that the rescission prayed for be so effected that the *status quo ante* shall be restored. It recognizes that that cannot be accomplished, because there is no way that the liabilities of the respondent which it assumed can be shunted back from its, the petitioner's, shoulders to those of the respondent alone where they formerly rested.

And so, while the petitioner treats its claim as based on a right to a rescission of the contract, it abstains from restoring or offering to restore anything which it obtained under the contract. In taking such a position it encounters the obstacle of certain fundamental principles applicable to the law of rescission which in their general application are thoroughly fixed and settled. Where a party has been led into a contract by the fraud of another, what are his remedies? In such case he has the choice of several courses open to him. The contract is not void. It is only

voidable, and being so, the defrauded party is put to an election of which of the courses open to him he chooses to follow. He may on the one hand, let the contract stand, retaining all that he obtained thereunder, and maintain an action at law to recover damages for the fraud, or, in case he is sued, he may set up his damages by way of recoupment. On the other hand, he may choose to regard the contract as never having been entered into and seek relief based on a rescission, in which event the relief afforded is by way of restoration of the parties to the *status quo ante*. These are general principles which it is sufficient for the moment to mention without attempting to elaborate upon the details or shades of their application. The election to which the aggrieved party is put will of course be exercised by him according as his best interests would suggest. As between affirmance on the one hand with its concomitant of a right to recover or recoup in damages, and rescission on the other hand, the defrauded party must make his choice. He cannot insist on both. To allow him to do so would be to permit him to assert in one breath that the contract is affirmed and in another that it is repudiated.

Furthermore it is fundamental that if the choice be made of rescission, there must be a restoration of the *status quo ante*, not only of the complainant but as well of the defendant. It is therefore necessary that the rescinding party should offer or tender such a restoration to the other, and that the court should be able to effectuate it by decree. *Black on Rescission and Cancellation,* (2d Ed.) § 616. This is the settled law. Though the application of the principle may be shown by the cases to be effectuated by a variety of mechanical devices, if I may call them such, made necessary by the diversity of fact situations, yet I know of no case where the relief of rescission has been afforded unless a just and equitable restoration of the substantial *status quo ante* could be accomplished.

The petitioner seeks to escape from the necessity of

restoring or offering to restore the *status quo ante* which the law exacts as a pre-requisite to the relief of rescission, by the argument that its case is such as to fall within an exception to the general rule. It argues that the property which it received from the respondent and which it insists on retaining is less in value than the value of the property obtained from it and which was disposed of by the respondent and cannot be restored; and when such is the case, it contends that equity will not require it to give up what it retains as a condition precedent to its right to recover what its adversary holds.

The principle contended for by the petitioner as applied to this case is made by a calculation to work out as follows: The petitioner surrendered property to the respondent and assumed debts owed by it, all of an admitted value of $3,767,338.76. This represents therefore what consideration the petitioner gave to the respondent. Against this, the respondent gave to the petitioner an acquittance from a debt, cash and 24,000 shares of petitioner's preference stock, all of a purported value of $3,767,-338.76. But inasmuch as the preference stock was worth only sixty-five instead of one hundred at which it was valued by the contract, it is contended that the petitioner received from the respondent a consideration of only $2,-927,338.76. Now the respondent cannot restore in specie, what it acquired. Some it has in hand (or the receivers have for it) and some it has disposed of. What is in hand is Jacksonville Gas bonds having a value of $314,250.00; and certain of the collateral released by reason of the sale in connection with the Fitkin transaction of the petitioner's debentures, said collateral standing to the extent of its value in lieu of the debentures. The value of this collateral is calculated by the petitioner to be $72,619.55. Thus the total of the consideration which the respondent acquired from the petitioner that now remains in the hands of the receivers either in original or converted form is stated to be $314,250.00 plus $72,619.55, or $386,869.55.

Now inasmuch as by reason of the alleged fraud the petitioner claims to have received only $2,927,338.76 by way of consideration, which is $840,000 below the amount which but for the respondent's fraud it would have received, the petitioner claims that equity should not require it to restore anything to the respondent as a condition to the right of rescission. If it keeps all that it originally received and takes from the respondent all of the original consideration which it received and which now remains in hand—even then the alleged fraud would not be fully repaid. There would still be a balance due on account of it of $453,130.41, for which the petitioner claims to be entitled to file a claim as a general creditor.

Why, says the petitioner, shall a vendor who has been defrauded by a fraudulent vendee, as a condition precedent to a rescission of the contract and a recovery of what remains of his goods undisposed of in the hands of his vendee, be required to restore to the vendee any part of the consideration received when that which is recoverable is less in value than enough to compensate for the damage done by the fraud? In such a case as the question puts, the petitioner contends that the law will permit the vendor to keep what he obtained and at the same time recover what remains in the hands of the vendee, notwithstanding the remedy appears to countenance a simultaneous recognition of the irreconcilables of affirmance and disavowal of the contract.

In support of its position the petitioner cites a number of cases. A brief reference to those cases will now be made. *Gay v. D. M. Osborne & Co.,* 102 *Wis.* 641, 78 *N. W.* 1079, is hardly of any pertinency, for in that case there was no sale and title never passed to the vendee. The other cases cited by the petitioner are *Tootle v. First National Bank,* 34 *Neb.* 863, 52 *N. W.* 396; *Sisson v. Hill,* 18 *R. I.* 212, 26 *A.* 196, 21 *L. R. A.* 206; *Farwell Co. v. Hilton,* (*C. C.*) 84 *F.* 293; *Schoonmaker v. Kelly,* 42 *Hun* (*N. Y.*) 299; and

*Pearse v. Pettis,* 47 *Barb.* (*N. Y.*) 276. These cases are all of the same type and it will be sufficient to illustrate their holding by reference to only one of them, viz., *Tootle v. First National Bank,* decided by the Supreme Court of Nebraska. In that case a vendor sold goods to a vendee at a stipulated price. The sale was induced by fraud. The vendee paid three hundred dollars on account of the purchase price. The vendee sold a part of the goods. The vendor then sued in replevin to recover from the vendee the goods remaining in his hands, thus choosing to rescind the contract. When it was objected that the vendor had not made tender back of the three hundred dollars and thus offered to restore the vendee to the *status quo ante,* the court said:

"He [vendor] must place the vendee as near in *statu quo* as the circumstances will permit. The seller is likewise entitled to receive back the property sold. And when the vendee has sold a part to innocent parties, so that he cannot make complete restitution to the original vendor, the latter may retain of the consideration received by him an amount equal to the value of the property parted with by the vendee, and tender the balance of the consideration."

Such is the nature of the cited cases. But the present case is not so simple in its fact aspects as the cited ones. Here we are not dealing with the ordinary contract for the sale of goods for money consideration alone. It is more complicated than that. The contract involved the purchase of securities by the respondent from the petitioner, a sale by the respondent of preference stock to the petitioner— all at stated values—and at the same time, these mutual purchases were thrown into hodge podge with certain debt obligations of the parties already outstanding, and the whole adjusted as an entirety, with a cash payment from the respondent to the petitioner rendered necessary to strike a balance.

Now the petitioner looks at one of the items of the transaction. viz., the twenty-four thousand shares of its

own preference stock, and in substance says to the respondent—you wrongfully caused me to pay too much for that stock, too much by $840,000; therefore, I choose to rescind that part of the transaction—but I will keep the twenty-four thousand shares and make good the $840,000 damage by taking away from you that amount of value out of the other assets you acquired or so much thereof as the other assets in your hands are capable of satisfying. But, let us turn the transaction around and look at it from the respondent's side. Looking at it that way, the respondent can say—I sold you twenty-four thousand shares of your preference stock at one hundred dollars per share—you want to keep it, but you want the price readjusted on the basis of sixty-five dollars a share and after readjusting the contract price on that basis, you desire to require me to hand back to you enough of other property I acquired from you in the same series of transactions to make good the difference between the value fixed by the contract between us and the value as it would be under a revised contract.

Is not that what the petitioner's position amounts to? It wants to compel the respondent in the last analysis to abide by a contract of sale of the preference stock at a price different from that which the contract named. "To rescind a sale is one thing, but to force on the vendor a contract to sell at another price is a totally different thing," was observed by Lord Davey in *Burland v. Earle, A. D.* (1902) 83. What the petitioner seeks to do is in substance to compel the respondent to abide by a contract to sell at a price other than that upon which it agreed to let the stock go for. I have seen no case which holds that that can be done. The cases cited by the petitioner do not support any such proposition. The thing which distinguishes those cases from this one is that the remedy which was afforded in them was one that was adjusted to the contract as written and without undertaking in any sense to make new price terms.

What right has the court to say that the respondent, while willing to sell the large block of preference stock at one hundred, should be compelled to let it go at sixty-five? Yet that is what the petitioner's insistence upon rescission calls upon the court to say. I am of the opinion that the contract cannot be played with in any such manner. If just and equitable restoration cannot be made by the parties, then the contract must stand and the petitioner, if aggrieved by a fraud, must look for relief to its appropriate remedy for damages.

There are two matters which were discussed on the briefs which I see no occasion for my commenting upon. Those matters are—whether (1) the purchase by the petitioner of its preference stock was at the expense of an impairment of its capital, and (2) whether said purchase constituted a distribution of petitioner's assets by way of return of capital to the respondent in violation of the rights of the petitioner's first preferred stockholders under its charter. I refrain from examining into those questions because they do not appear to me to be of significance in connection with the appropriateness of rescission as the same is prayed for by the pending petition.

Order in accordance with the foregoing.