Filed:  October 19, 2004

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 03-1985
(CA-98-17-7-F)

JOSEPH D. GRIGGS,

Plaintiff - Appellee,

versus

E.I. DUPONT DE NEMOURS & COMPANY,

Defendant - Appellant.

O R D E R

The court amends its opinion filed September 29, 2004, as follows:

On page 25, first line of footnote * -- "Griggs" is corrected to read "DuPont" and "his" is corrected to read "its."

For the Court - By Direction

   /s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOSEPH D. GRIGGS,

*Plaintiff-Appellee,*

v.

E. I. DUPONT DE NEMOURS &
COMPANY,

*Defendant-Appellant.*

No. 03-1985

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CA-98-17-7-F)

Argued: June 4, 2004

Decided: September 29, 2004

Before WILKINS, Chief Judge, and NIEMEYER and
TRAXLER, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Traxler wrote the majority opinion, in which Judge Niemeyer
joined. Chief Judge Wilkins wrote a concurring and dissenting opin-
ion.

## COUNSEL

**ARGUED:** Raymond Michael Ripple, E. I. DU PONT DE
NEMOURS & COMPANY, Wilmington, Delaware, for Appellant.
Michael Murchison, MURCHISON, TAYLOR & GIBSON, P.L.L.C.,

Wilmington, North Carolina, for Appellee. **ON BRIEF:** David F. Dabbs, MCGUIREWOODS, L.L.P., Richmond, Virginia; Donna L. Goodman, E. I. DU PONT DE NEMOURS & COMPANY, Wilmington, Delaware, for Appellant.

---

## OPINION

TRAXLER, Circuit Judge:

At the heart of this case, which is before us for a second time, *see Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371 (4th Cir. 2001) ("*Griggs I*"), are questions about the propriety of a rescissionary remedy in an action governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001-1461 (West 1999 & Supp. 2004). We conclude that, in general, rescission is a remedy traditionally available in equity and that rescission is therefore a proper remedy under ERISA. As to this case, however, we conclude that the district court erred with regard to certain aspects of the equitable relief that it fashioned. Accordingly, we affirm in part, vacate in part, and remand.

I.

Joseph Griggs, a long-time employee of E.I. DuPont de Nemours & Co., took early retirement in 1994 after learning that he was eligible to participate in DuPont's temporary pension system ("TPS"), a program that paid eligible employees one month's salary for every two years of service. All of the TPS information that DuPont provided to eligible employees stated that the TPS benefit could be taken in the form of a lifetime annuity with monthly payments that would be subject to federal tax or as a lump sum that could be rolled over tax-free into an IRA or other qualified retirement account. Griggs elected the lump-sum distribution, which was calculated to be $132,900. Before Griggs officially retired, however, DuPont learned that because of Griggs's salary level, his lump sum TPS benefit could not be rolled over and would be subject to federal tax. DuPont never corrected the information it had given Griggs and never told Griggs that his lump-sum TPS benefit would be taxed. When Griggs retired, DuPont gave

him a check for the amount of his TPS benefit, less approximately $50,000 in federal taxes. Griggs ultimately paid approximately $58,000 in taxes on his TPS benefit, leaving Griggs with a net TPS distribution of $74,627.

Griggs filed an action in North Carolina state court, claiming that DuPont negligently misrepresented to him the tax consequences of his TPS election. Because Griggs's state-law claims were preempted by ERISA, DuPont removed the case to federal court. The district court concluded that DuPont breached its fiduciary duty by failing to tell Griggs that he was ineligible for a tax-free lump sum distribution, but that ERISA provided no remedy for DuPont's wrong.

On appeal, this court concluded that some equitable remedy might be available to Griggs, perhaps reinstatement of Griggs to his prior position, or reinstatement to the benefit plan so that he could make a new TPS election. Accordingly, we remanded for further proceedings before the district court:

> [W]e remand for further factual development with respect to whether the reinstatement of the parties to the pre-election status quo is appropriate. In determining whether such relief is appropriate, the district court's consideration should be broader than the question of whether it would be appropriate, or even possible at this point, to reinstate Griggs to his job. The district court should also consider whether it would be appropriate, or even possible, to return Griggs to his pre-election position so that he could make an alternate TPS distribution election. In either event, we note that because reinstatement is equitable in nature, Griggs is not entitled to a windfall; if he is reinstated, we agree with the district court that he must return his TPS benefit. Indeed, Griggs concedes that he would be required to return at least part of his TPS distribution. We will leave it to the sound discretion of the district court to consider the subtleties that will surely arise, including what portion of Griggs's benefit he must return if equitable relief is appropriate, *i.e.*, on whom the loss occasioned by the tax liability should fall.

*Griggs I*, 237 F.3d at 385-86.

After remand, the district court concluded that reinstating Griggs to his prior position would not be appropriate. The court noted that Griggs had been out of the work force since 1994, and that the changes in the company and technological advancements in the industry "would render Griggs's efficacy in his former position questionable, at best." J.A. 288. Moreover, reinstating Griggs "would require the displacement of an incumbent employee." J.A. 287. Thus, the court declined to order reinstatement. Because Griggs has not appealed this aspect of the district court's order, we will not consider whether reinstatement of Griggs to his prior position would have been proper.

The court did, however, conclude that it would be appropriate to allow Griggs to rescind his election to take his TPS benefit as a lump-sum and to instead select the lifetime annuity option.[1] The court ordered DuPont to pay Griggs a lump sum of the monthly annuity payments, retroactive to the date of his original TPS election— $78,861. Because the monthly annuity payment is fully taxable, the court determined that Griggs would be taxed twice on the same money if he were required to repay DuPont the gross amount of the TPS benefit he recovered. The district court therefore ordered Griggs to repay only the amount he actually received, net of taxes—$74,627. The court ordered Griggs to pursue all available avenues for recovering the state and federal taxes paid on the original TPS lump-sum distribution, and the court required Griggs to involve DuPont in this process, for example, by submitting his proposed tax filings to DuPont 30 days before filing with the IRS and conferring with DuPont about any communication he might receive from the IRS. Any money that Griggs recovered was to be turned over to DuPont. By separate order, the district court awarded Griggs more than $40,000 in attorney's fees and costs.

DuPont appeals. DuPont first contends that the rescissionary remedy ordered by the district court is not proper in an ERISA action. Alternatively, DuPont argues that even if rescission might, in general,

---

[1]This rescissionary relief is what we characterized in *Griggs I* as reinstatement to Griggs's pre-election position for purposes of making a new TPS election. We will continue the practice of the district court and the parties and refer to this remedy as rescission.

be an appropriate remedy in some ERISA cases, it is not appropriate in this case, because the parties cannot be fully restored to their prior positions. Finally, DuPont challenges the award of attorney's fees and costs.

## II.

## A.

Griggs is proceeding under section 502(a)(3) of ERISA, which authorizes a beneficiary or participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C.A. § 1132(a)(3) (West 1999). Griggs is not seeking an injunction, but is instead seeking "other appropriate equitable relief" under section 502(a)(3)(B). The question, then, is whether the relief Griggs sought and was awarded is "appropriate equitable relief."

In *Mertens v. Hewitt Associates*, 508 U.S. 248 (1993), the Supreme Court considered the scope of relief available under section 502(a)(3)(B). While recognizing that ERISA's roots are grounded in the law of trusts, the Court rejected the argument that "appropriate equitable relief" under section 502(a)(3)(B) should mean whatever relief a common-law court of equity could have granted in a breach of trust case. The Court noted that with regard to trust actions, courts of equity could award monetary damages, the quintessential *legal* remedy, and that courts of equity in other situations could "establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority." *Id.* at 256 (internal quotation marks omitted). Given the broad powers available to equity courts, particularly in breach of trust actions, the Supreme Court explained that to read section 502(a)(3)(B) as authorizing "all relief available for breach of trust at common law" would render meaningless Congress' attempt to limit relief to appropriate equitable relief:

> Since *all* relief available for breach of trust could be obtained from a court of equity, limiting the sort of relief obtainable under § 502(a)(3) to "equitable relief" in the

sense of "whatever relief a common-law court of equity could provide in such a case" would limit the relief *not at all*. We will not read the statute to render the modifier superfluous.

*Id.* at 257-58 (internal footnote omitted). The Court therefore concluded that under section 502(a)(3), relief was limited "to those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Id.* at 256.

Relying on *Mertens*, this court in *Griggs I* concluded that the remedy sought by Griggs was typically available in equity and thus generally permissible under section 502(a)(3). *See Griggs I*, 237 F.3d at 384-85. In this appeal, DuPont seeks to re-argue this point, contending that it is inconsistent with the Supreme Court's opinion in *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), which was issued after this court's decision in *Griggs I*. As we explain below, we do not believe that *Great-West* requires us to reject the conclusion we reached in *Griggs I*.

In *Great-West*, Janette Knudson, a beneficiary of an ERISA-governed employee welfare benefit plan, was injured in a car accident. The plan included a reimbursement provision that provided the plan with "the right to recover from the beneficiary any payment for benefits paid by the Plan that the beneficiary is entitled to recover from a third party." *Great-West*, 534 U.S. at 207 (internal quotation marks and alteration omitted). The Great-West plan covered more than $400,000 of Knudson's medical expenses, and Great-West brought an action under section 502(a)(3) seeking restitution of the medical expenses it had paid on Knudson's behalf.

Relying on *Mertens*, the Supreme Court noted that Great-West's claim could be brought under ERISA only if the relief it was seeking fell within those categories of relief that were typically available in equity. *See Great-West*, 534 U.S. at 210. The Court explained that restitution claims can sound in equity or at law, depending on the nature of the relief sought in the particular case:

> [A] plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where

money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession. A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. But where the property sought to be recovered or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the defendant. Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.

*Id.* at 213-14 (internal citations, quotation marks, and alterations omitted). The Supreme Court then noted that the funds sought by Great-West were not in Knudson's possession, but instead had been disbursed into a special needs trust to pay for Knudson's future medical expenses. Great-West thus was not seeking equitable relief under section 502(a)(3)(B), because it was not claiming "particular funds that, in good conscience, belong to petitioners," but was instead arguing that it was "contractually entitled to *some* funds for benefits that they conferred." *Id.* at 214. The Court therefore concluded that "[b]ecause petitioners are seeking legal relief—the imposition of personal liability on respondents for a contractual obligation to pay money—§ 502(a)(3) does not authorize this action." *Id.* at 221.

At one level, the Supreme Court in *Great-West* simply applied the rule announced in *Mertens* to a specific category of equitable claim—namely, a claim for restitution. *Great-West* did not alter the rule announced in *Mertens*, and this court in *Griggs I* reached its conclusion by applying the *Mertens* rule. To that extent, then, *Griggs I* cannot be viewed as inconsistent with *Great-West*.

The *Great-West* Court did, however, expand upon the *Mertens* rule in a way that is relevant to this case, by focusing for the first time on the differences between restitution at law and restitution in equity "[i]n the days of the divided bench." *Great-West*, 534 U.S. at 212.

Because *Griggs I* was decided before *Great-West*, we did not then consider whether, in the days of the divided bench, the rescission claim asserted by Griggs would have fallen on the law or equity side of the divide. We consider that question now.

B.

"A rescission is an avoidance of a transaction. . . . Except as the parties might agree to the contrary, rescission will normally be accompanied by restitution on both sides." Dan B. Dobbs, *Handbook on the Law of Remedies* § 4.3 at 254 (West 1973). Like the restitution claim involved in *Great-West*, a rescission claim can sound in law or in equity.[2]

Broadly speaking, rescission at law occurs when the plaintiff has a right to unilaterally avoid a contract. The rescission itself is effected when the plaintiff gives notice to the defendant that the transaction has been avoided and tenders to the defendant the benefits received by the plaintiff under the contract. *See Handbook on Remedies*, § 4.3 at 255.

> Once the plaintiff has rescinded, he is entitled to recover back what he gave under the contract. If the defendant does not give it back voluntarily, the plaintiff may sue for it . . . . Thus the court in cases of rescission "at law" does not effect the rescission and the court's only role is to get back the plaintiff's property or its value.

*Id.* § 4.8 at 293; *see also Acton v. J.B. Deliran Corp.*, 737 P.2d 996,

---

[2] In *United States v. Scruggs*, 356 F.3d 539 (4th Cir.), *cert. denied*, 124 S. Ct. 2429 (2004), this court noted the various meanings that historically have been associated with the term "rescission" and that the Uniform Commercial Code and the *Restatement (Second) of Contracts* "now employ different words to distinguish among the various causes of contract termination—all of which have been characterized, at one time or another, as 'rescission.'" *Id.* at 545. Because *Great-West* requires us to resolve this ERISA case by considering the law in existence "[i]n the days of the divided bench," *Great-West*, 534 U.S. at 212, we will believe it is proper to refer to the cause of action here as one seeking rescission.

999 n.5 (Utah 1987) ("Rescission at law is accomplished without the aid of a court. It is completed when, having grounds justifying rescission, one party to a contract notifies the other party that he intends to rescind the contract and returns that which he received under the contract.").

An action for rescission in equity, however, "is not a suit based upon the rescission already accomplished by the plaintiff, but a suit to have the court decree a rescission." *Handbook on Remedies* § 4.8 at 294. Thus,

> [i]n equity . . ., the rescission is effected by the decree of the equity court which entertains the action for the express purpose of rescinding the contract and rendering a decree granting such relief. In other words, a court of equity grants rescission or cancellation, and its decree wipes out the instrument, and renders it as though it does not exist.

*Haumont v. Security State Bank*, 374 N.W.2d 2, 7 (Neb. 1985); *see also Maumelle Co. v. Eskola*, 865 S.W.2d 272, 274 (Ark. 1993) ("With rescission in equity the affirmative powers of the court of equity are used to rescind, or undo, the contract."); *Omlid v. Sweeney*, 484 N.W.2d 486, 490 (N.D. 1992) ("A rescission action at law is essentially an action for restitution based upon a party's prior unilateral rescission whereas an action in equity seeks to have the court terminate the contract and order restoration."). Resort to a court of equity is typically required if effective restitution can be obtained only through the cancellation or amendment of a document. *See Handbook on Remedies* § 4.3 at 255.

Here, Griggs cannot unilaterally "unretire" by returning his TPS benefit and returning to work. Instead, Griggs seeks to amend his TPS election to select a monthly annuity rather than lump sum payment. Thus, in this case, it is clear that the type of rescission involved is equitable, not legal.[3]

---

[3]We note that both before and after *Great-West* was decided, other courts have likewise concluded, albeit under different factual circumstances, that actions seeking rescission are equitable actions that may be

C.

DuPont, however, contends that because the district court did not require Griggs to repay the gross amount of the TPS lump sum benefit, this case actually involves partial rescission, which DuPont contends is a remedy that was not typically available in a court of equity. Thus, DuPont argues that *Great-West* prohibits Griggs's claim.

This argument is premised on an assumption that courts of equity always required full or complete restoration of the benefits exchanged in every case where a plaintiff sought rescission of an instrument. We acknowledge that support for such a proposition can be found in some of the leading commentaries on the subject. *See Handbook on Remedies* § 9.4 at 622 ("The general rule . . . is that the adult plaintiff must make restoration of what he got under the contract in order to get rescission, and his inability to do so will not excuse such restoration. In such a case, he may be permitted to recover damages, but rescission will be barred by his inability to make restoration to the defendant."); Richard A. Lord, *Williston on Contracts* § 69:50 (4th ed.) ("Ordinarily, one cannot in equity seek to rescind a contract on the ground of fraud and, at the same time, retain the benefits derived from that contract . . . . [T]he decree in such a suit will provide, not simply for the return by the defendant of what was wrongfully acquired, but for the restoration of the consideration by the plaintiff."). Similar language also appears in many cases discussing equitable rescission. *See Pinter v. Dahl*, 486 U.S. 622, 641 n.18 (1988) (noting that equitable rescission provides "for restoration of the status quo by requiring the buyer to return what he received from the seller"); *Rexford v. Southern Woodland Co.*, 208 F. 295, 314 (D.S.C. 1913) ("The duty of one party to a contract, who seeks to rescind, to restore to the other party

pursued under ERISA. *See Provident Life & Accident Ins. Co. v. Sharpless*, 364 F.3d 634, 639-40 (5th Cir. 2004) (concluding that ERISA permits an action seeking rescission of an ERISA-governed insurance policy if a beneficiary makes a material misrepresentation when applying for the policy); *accord Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 902-03 (8th Cir. 2003); *Security Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1191 (9th Cir. 1998) (per curiam); *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 943-44 (6th Cir. 1997).

the amount received by him in part performance, or on account of the contract, is well settled and always enforced."); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 13-14 (N.Y. 1972) (explaining that rescission is an equitable remedy that should be invoked "where the *status quo* may be substantially restored . . . . [If] damages appear adequate and it is impracticable to restore the *status quo*," rescission is inappropriate); *National Life Ins. v. Hanna*, 7 S.E.2d 52, 54 (W. Va. 1940) ("'[A]ny person demanding the rescission of a contract to which he is a party must restore or offer to restore to the other party *whatever he may have received under the contract* in the way of money, property, or other consideration or benefit.'" (quoting 3 *Black on Rescission and Cancellation* (2d ed.) § 617)); *Hegarty v. American Commonwealths Power Co.*, 163 A. 616, 619 (Del. Ch. 1932) (explaining that for rescission to be granted, "there must be a restoration of the status quo ante, not only of the complainant but as well of the defendant. It is therefore necessary that the rescinding party should offer or tender such a restoration to the other, and that the court should be able to effectuate it by decree. This is the settled law." (citation omitted)).[4]

A closer review of the relevant authorities, however, reveals that the complete-restoration requirement is a general one that is subject to certain exceptions. Various standards have been articulated when an exception to the complete-restoration rule is warranted. While a few courts speak in formal terms of very specifically delineated

---

[4]Because no statutory provision addresses the contours of the rescissionary remedy that we have concluded is proper under section 502(a)(3), the question is one of federal common law. *See United McGill Corp. v. Stinnett*, 154 F.3d 168, 171 (4th Cir. 1998) ("In enacting ERISA, Congress intended for the judiciary to develop a body of federal common law to supplement the statute's express provisions."). When fashioning federal common law, "we may look to state law for guidance to the extent that state law does not conflict with ERISA or its underlying policies." *Shipley v. Arkansas Blue Cross & Blue Shield*, 333 F.3d 898, 902 (8th Cir. 2003); *see Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir. 1992) ("While it is inappropriate to use state common law to re-write ERISA, it is also inappropriate to hold that state common-law causes of action that have been preempted by ERISA may not be used to assist in shaping a body of federal common law." (citation and internal quotation marks omitted)).

exceptions to the general rule requiring complete restoration of benefits,[5] it appears that what is most often applied is some form of a requirement to consider the equities of the situation and apply an exception to the general rule where required. *See Grymes v. Sanders*, 93 U.S. 55, 62 (1876) ("A court of equity is always reluctant to rescind, unless the parties can be put back in statu quo. If this cannot be done, it will give such relief only where the clearest and strongest equity imperatively demands it."); *Kobatake v. E.I. DuPont de Nemours & Co.*, 162 F.3d 619, 626 (11th Cir. 1998) (explaining that "in order to rescind, the defrauded party must . . . restore or offer to restore to the other party whatever he has received by virtue of the contract if it is of any value. However, a party need not tender back what he is entitled to keep, and need not offer to restore where the defrauding party has made restoration impossible, or *when to do so would be unreasonable*." (citation and internal quotation marks omitted; emphasis added)); *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 587 (Tex. App. 1998) ("[R]escission may be allowed without complete restoration where the particular circumstances indicate that to be the more equitable result."); *Braman Dodge, Inc. v. Smith*, 515 So. 2d 1053, 1054 (Fla. Dist. Ct. App. 1987) ("Where restoration to the status quo is impossible, however, a court may still grant rescission, provided the equities between the parties can be balanced."); *Rafferty v. Heath*, 78

---

[5]For example, Maryland courts appear to apply a rigid set of exceptions to the complete-restoration rule:

> [W]here on the particular facts it seems equitable to allow rescission without complete or perfect restoration of consideration, the modern tendency is to allow the relief . . . . Equity will in an appropriate case order rescission without restoration if: (1) the performance by the one against whom rescission is sought has become worthless, or (2) the respondent has prevented its return, or (3) the performance conferred only an intangible benefit upon the complainant, or (4) only a promise was given, or (5) the complaint can properly retain it irrespective of the voidable transaction, or (6) it is in possession of or is subject to the order of a person having a right superior to the complainant, or (7) restoration is impossible for some reason not hereinbefore mentioned and the clearest and strongest equity demands that rescission be granted (sometimes with a monetary substitute for restoration).

*Funger v. Mayor of Somerset*, 223 A.2d 168, 173-74 (Md. 1966).

S.E. 641, 642 (Va. 1913) ("If . . . in a particular case a court of equity finds that a condition exists which renders it impossible to restore the parties substantially to their original position, *and that to rescind the contract would result in an injustice*, the rescission will be refused." (emphasis added)); *Fairbanks, Morse & Co. v. Walker*, 92 P. 1129, 1131 (Kan. 1907) ("We understand the rule to be that the person who rescinds must always return all benefits received from the contract, and the status quo restored, not absolutely, but so far as possible, or the merits demand."); *Williston on Contracts* § 69:51 ("The requirement of restoration, however, is subject to several exceptions . . . . [W]here on the particular facts it seems equitable to allow rescission without complete or perfect restoration of the consideration, the growing tendency favors the relief, and courts of law adopting the more liberal rule in equity no longer adhere to the strict construction generally upheld in the earlier decisions."). Thus, it is clear to us that courts of equity did not automatically deny relief to a plaintiff seeking rescission in cases where complete restoration of benefits could not be accomplished. Instead, courts of equity would order rescission where the equities of the situation so demanded.

Although this formulation of the exception is somewhat broad, we believe that it gives federal courts the flexibility necessary to appropriately balance the interests of participants and beneficiaries of ERISA plans against the interests and obligations of ERISA employers and fiduciaries. *See United McGill Corp. v. Stinnett*, 154 F.3d 168, 171 (4th Cir. 1998) ("In enacting ERISA, Congress intended for the judiciary to develop a body of federal common law to supplement the statute's express provisions."); *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir. 1993) ("Where the statute is silent, courts must construct a common law that effectuates the policies underlying ERISA."). A rule generally requiring full restoration of benefits to accompany a grant of rescission protects the financial integrity of ERISA plans, while permitting an exception to this rule when the equities of the situation demand provides a necessary incentive for ERISA fiduciaries to take seriously their obligations to protect the interests of the participants and beneficiaries. Because we conclude as a matter of federal common law that rescission in the ERISA context may be granted even if a full restoration of the benefits conferred in the transaction cannot be accomplished, we cannot agree with

DuPont's contention that the "partial rescission"[6] ordered in this case means that the remedy is not one typically available in equity within the meaning of *Great-West*.

D.

In light of these conclusions, what remains for our consideration is whether the partial rescission (or, perhaps more accurately, the rescission accompanied by less than complete restoration of benefits) ordered by the district court was appropriate. *See* 29 U.S.C.A. § 1132(a)(3)(B) (authorizing a beneficiary or participant to bring a civil action "to obtain other *appropriate* equitable relief" (emphasis added)); *Griggs I*, 237 F.3d at 385 (explaining that "even if the redress sought by a beneficiary under ERISA § 502(a)(3) is a classic form of equitable relief, it must be *appropriate* under the circumstances"). As we explain below, we agree with DuPont that it has been prejudiced by Griggs's delay in seeking a judicial rescission of his TPS election. In our view, that prejudice to DuPont renders inappropriate the relief fashioned by the district court.

If a plaintiff unreasonably delayed seeking rescissionary relief, courts of equity typically denied relief to the plaintiff. Although the authorities are not entirely consistent on this point, the delay must generally have been prejudicial to the defendant to justify denial of relief. *See Restatement (First) of Restitution* § 64 (1937) ("An unreasonable delay in manifesting an avoidance of a transaction after the

---

[6]In this case, the ultimate question is whether, as a result of DuPont's breach of its fiduciary duty, Griggs is entitled to rescind his original TPS election. The district court permitted a full rescission of that election, but in return required only a partial restoration (or restitution) of the benefits received by Griggs. Thus, we are not certain that the partial restoration ordered by the court transforms the remedy into one of "partial rescission," as DuPont describes it. *Cf. Lummus Co. v. Commonwealth Oil Ref. Co.*, 280 F.2d 915, 927-28 (1st Cir. 1960) (in case where plaintiffs apparently sought to rescind only certain clauses of a contract, explaining that "there cannot be a partial rescission. It is fundamental that a single agreement cannot be rescinded in part and affirmed in part."). This case, however, does not turn on whether the remedy is described as involving partial rescission or rescission with partial restoration.

acquisition of knowledge of the facts terminates the power of rescission for fraud or mistake, and the consequent right to restitution, if the interests of the transferee or of a third person are harmed or were likely to be harmed by such delay."); *see also Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 47 (2d Cir. 1991) ("An action for rescission must be initiated without unreasonable delay, unless the delay is caused by the party against whom rescission is sought." (citation omitted)); *Baumel v. Rosen*, 412 F.2d 571, 574-75 (4th Cir. 1969) (explaining that "[r]escission is a radical move, and the law exacts the election of that course to be asserted without wait," and concluding that 18-month delay precluded plaintiffs' request to rescind a stock sale); *Hay v. Albrecht*, 523 N.E.2d 211, 213-14 (Ill. App. Ct. 1988) ("The defense of *laches* [in an action seeking rescission] is only applicable if there has been unreasonable delay in asserting a right coupled with prejudice to the opposing party as a result of the delay."); *Dent v. Long*, 7 So. 640, 642 (Ala. 1890) ("Though a party has the right to determine whether or not he will rescind a contract, so long as he has made no election, if, while considering, the position of the other party is materially affected or changed, . . . he will be precluded from exercising his right to rescind.").

As discussed above, any exception to the general rule of full restoration is dependent upon a determination that the equities of the situation demand making such an exception. If Griggs unreasonably delayed seeking rescission and that delay prejudiced DuPont, then it would be difficult for us to conclude that the less than complete restoration of benefits ordered by the district court was appropriate.

Griggs became aware of DuPont's breach of fiduciary duty in the fall of 1994, when he received his TPS distribution and learned that he could not avoid the tax consequences of the lump-sum distribution. He did not file suit until January 1998, and even then he did not seek rescission of his TPS election—he sought legal damages for DuPont's negligent misrepresentation of the tax consequences of the TPS election. It was not until March 1999, after the district court ruled that Griggs's state-law claim was preempted by ERISA, that Griggs first sought equitable relief from DuPont. Thus, more than four years elapsed between the time that DuPont breached its fiduciary duty to Griggs and Griggs notified DuPont that he intended to renounce his TPS election.

As DuPont points out, federal law requires that an action seeking a refund or credit for overpaid taxes must be filed within three years after the tax return was filed or two years after the tax was actually paid, whichever is later. *See* 26 U.S.C.A. § 6511(a) (West 2002). Assuming that Griggs filed his 1994 tax return and paid the taxes on April 15, 1995, the statute of limitations under section 6511(a) would have expired on April 15, 1998. If the action contemplated by section 6511 were Griggs's only means of recourse with regard to the federal taxes, then the district court's requirement that Griggs try to recover the taxes paid on the distribution would be largely meaningless and DuPont quite clearly would have been prejudiced by Griggs's delay in seeking rescission.

At a June 2002 hearing before the district court after our first remand, however, a tax specialist for DuPont explained that even at that date there was another avenue that Griggs could pursue in the event that rescission were ordered—Griggs could seek relief under the mitigation provisions of the Internal Revenue Code. *See* 26 U.S.C.A. §§ 1311-14 (West 2002); *Longiotti v. United States*, 819 F.2d 65, 67-68 (4th Cir. 1987) ("The mitigation provisions permit the correction of an error made in a prior tax year even though the ordinary limitations period has run."). We need not decide whether Griggs would in fact be entitled to recoup his tax payments under the mitigation provisions, and the record is not sufficiently developed to allow such a determination to be made even if we were so inclined. For purposes of this opinion it is sufficient to note the time has expired on what would have been Griggs's most direct path to recoupment of the taxes and that full recovery of the taxes paid is now an uncertain prospect at best. This uncertainty of recovery, which is borne solely by DuPont, suggests that Griggs's delay in seeking rescission has worked to the detriment of DuPont.

We should note, however, that Griggs complained to DuPont about the amount of his TPS distribution immediately upon receiving it. Thus, it cannot be said that DuPont had no knowledge of a potential problem with the transaction until Griggs filed suit. Moreover, the record indicates that around the time that the TPS distribution was made, DuPont itself considered the possibility of "unscrambl[ing] the omelet" by re-wiring the money and changing Griggs's TPS election from lump-sum to monthly annuity. J.A. 163. DuPont decided against

that course of action and took the position throughout the litigation that Griggs's TPS election was irrevocable.

Nonetheless, even with these considerations that weigh in Griggs's favor, we are constrained to conclude that Griggs delayed unreasonably in seeking judicial relief. If Griggs had promptly filed suit against DuPont, the preemptive force of ERISA would have been recognized sooner and Griggs's claims could have been whittled down to the only claim viable under ERISA (rescission of the TPS election for the purposes of making a new election) at a point when the surest means of recouping the tax payments would not have been faced with limitations problems. Under the district court's order, DuPont bears the entire (and very real) risk that Griggs will not recover the full amount of his tax payments. We see no way to view that risk, borne solely by DuPont, as anything but a real and significant prejudice caused by Griggs's failure to promptly seek rescission of his TPS election.

Accordingly, we conclude that the relief fashioned by the district court in this case is not appropriate equitable relief, as required by ERISA section 502(a)(3)(B), because the relief fails to account for the prejudice that Griggs's delay has worked upon DuPont. But contrary to DuPont's argument, we do not believe that this conclusion compels us to deny Griggs any form of rescissionary relief.

Griggs's delay in seeking rescission has made the ultimate recovery of the taxes paid on the TPS distribution much more difficult and uncertain, and it therefore is not appropriate to require DuPont to bear the risk that the taxes will not be recovered. Griggs's delay, however, has prejudiced DuPont *only* because the district court's order requires DuPont to bear the risk that Griggs will be unable at this late date to recoup the full amount of the taxes paid on the TPS distribution. That is, DuPont has identified no way in which Griggs's delay has prejudiced it with regard to the most important aspect of the district court's order—the requirement that Griggs's original TPS election be rescinded and that Griggs be permitted to elect a monthly distribution instead. To refuse to grant rescission to Griggs because one aspect of the district court's order was inappropriate, as DuPont would have us do, would be unduly punitive to Griggs and would permit DuPont to skirt all responsibility for its breach of fiduciary duty, all without

serving any of ERISA's goals. What we must instead consider is whether a rescissionary remedy can be fashioned that will eliminate the prejudice to DuPont stemming from Griggs's delay in seeking rescission. *See Williston on Contracts* § 69:51 ("Where circumstances permit, some courts also have allowed as a substitute for restoration of the consideration a deduction of the amount of it from the recovery against the wrongdoer. This is the most practicable and satisfactory disposition of many cases."); *Henson v. James M. Barker Co.*, 555 So. 2d 901, 909 (Fla. Dist. Ct. App. 1990) ("In the event restoration to the status quo is impossible, rescission may be granted if the court can balance the equities and fashion an appropriate remedy that would do equity to both parties and afford complete relief."); *cf. Restatement (First) of Restitution* § 65 (1937) ("The right of a person to restitution for a benefit conferred upon another in a transaction which is voidable for fraud or mistake is dependent upon his return or offer to return to the other party anything which he received as part of the transaction or, where specific restoration is not required under the rule stated in § 66, its value, except where such thing . . . (f) consists of money which can be credited if restitution is granted.").

In our view, such a result can be accomplished by revising the district court's order in the following respects. First, Griggs must repay to DuPont the net amount of TPS distribution received by Griggs. In return, Griggs must be allowed to rescind his initial TPS election and opt for a monthly annuity payment instead of a lump-sum distribution. The amount of that monthly annuity payment, however, must be determined by reference to the TPS distribution net of all taxes paid by Griggs ($74,627), rather than by the gross amount of the TPS distribution ($132,900). That is, those actuarial assumptions that yielded an annuity payment of $796.58 per month based on a lump-sum distribution amount of $132,700 should be applied to calculate a monthly payment amount based on the $74,627 that Griggs must repay. Because the monthly benefit that DuPont must pay is reduced to an amount reflective of the net TPS distribution that Griggs must repay, the effect of the potential tax loss is borne by Griggs, not DuPont. Thus, under this plan, there would be no reason to *require* Griggs to take steps to recover his tax payments (although it is certainly in his interest to do so), and Griggs would have no obligation to turn over to DuPont any amount that he might recover from the taxing authorities. All other aspects of the district court's order would

remain in effect, including the requirement that DuPont's obligation to make the monthly payments is retroactive to Griggs's original 1994 retirement date.

We raised the prospect of this form of relief at oral argument, and we permitted the parties to file supplemental briefs addressing the issue. DuPont's primary argument against this proposal is that the proposed relief is simply another form of partial rescission, which DuPont contends is not a typical equitable remedy. However, as we have already explained, the inability to compel full restoration of benefits received under the instrument to be rescinded does not automatically preclude the granting of equitable rescission. DuPont's argument, therefore, is without merit.

In our view, the relief we have described above is the most equitable remedy available for these unfortunate circumstances. Because Griggs's delay in seeking rescission has lessened the likelihood that he will be able to recover the tax payments made on the lump-sum distribution, our remedy properly forces Griggs, not DuPont, to bear the risk that the tax payments will not be fully recovered. Under these circumstances, Griggs's delay in seeking rescission works no prejudice on DuPont, thus making it proper and equitable to grant rescission without requiring Griggs to make complete restoration of the benefits he received in connection with his initial lump-sum election. At the same time, because the relief we describe allows Griggs to rescind his lump-sum election and instead receive a monthly payment for life (albeit in a lesser amount), DuPont's breach of fiduciary duty does not go unremedied.[7]

In his supplemental brief Griggs counters the arguments made by DuPont and contends that the remedy we proposed is a proper form of equitable relief that is appropriate under ERISA. Griggs, however, is less than enthusiastic about the prospect of the district court's order being modified in such a manner. As we have explained in detail

---

[7]DuPont's claim that the proposed relief would impermissibly re-write its benefits plan is without merit. Neither ERISA nor the benefit plan addresses a participant's right to rescission based on DuPont's breach of fiduciary duty. It is thus entirely proper for us to develop federal common law to fill in these gaps. *See Stinnett*, 154 F.3d at 171.

above, we believe that Griggs's delay in seeking rescission makes it inequitable for DuPont to bear the risk that the tax payments will not be fully recovered. Thus, the district court's order as it stands cannot be affirmed. DuPont, of course, could be relieved of this inappropriate risk by our amending the district court's order to require that Griggs repay the gross amount of the TPS distribution, an option that would likewise eliminate the need to require Griggs to try to recover the tax payments or to turn over any such recovery to DuPont. Although there is no indication in the record that Griggs would find this remedy preferable to the one we proposed at oral argument, there is no reason to foreclose that possibility at this stage of the proceedings. Thus, on remand Griggs will have the option of choosing from the two alternatives we have outlined above. Griggs may elect to repay the gross amount of the TPS lump-sum benefit and to receive a monthly annuity based on that amount, or Griggs may elect to repay the net amount of the TPS lump-sum benefit and receive a reduced monthly payment.

Accordingly, while we affirm the district court's decision to rescind Griggs's TPS election, we conclude that it was inappropriate in this ERISA action to place upon DuPont the entire risk that Griggs will be unable to recover the full amount of the taxes paid on the lump-sum distribution. We therefore vacate the district court's order and remand. On remand, the district court shall conduct additional proceedings as necessary to enter a revised order and judgment consistent with the option elected by Griggs.

## III.

Finally, we turn to DuPont's challenge to the district court's award of attorney's fees to Griggs. ERISA provides that in an action brought "by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C.A. § 1132(g)(1). Although the statute is silent in this regard, we have interpreted section 1132 as authorizing an award of attorney's fees only to a prevailing party. *See Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1210 (4th Cir. 1997) ("[O]nly a prevailing party is entitled to consideration for attorneys' fees in an ERISA action.").

On appeal, DuPont contends that Griggs was not a prevailing party. Relying on a statement made by Griggs during discovery, DuPont

argues that Griggs himself has declared that he would derive "no material benefit" from the relief fashioned by the district court. DuPont claims that if the district court's remedy would give Griggs no material benefit, then Griggs cannot be viewed as a prevailing party. This argument is without merit.

We first note that DuPont's argument depends upon a mischaracterization of Griggs's statement. Griggs did not indicate that he would receive no material benefit from the remedy ordered by the district court; he indicated that he would perceive no material benefit if he were required to repay the gross amount of the TPS lump-sum distribution. More importantly, however, whether or not Griggs is personally happy with the verdict he receives is not determinative of the legal question of whether he is a prevailing party. *See Smyth v. Rivero*, 282 F.3d 268, 274 (4th Cir. 2002) ("The designation of a party as a prevailing party . . . is a legal determination which we review de novo.").

As noted above, section 1132 does not include any "prevailing party" language. We believe, however, that our implied prevailing-party requirement must carry the same meaning as the phrase does when it is an explicit part of a fee-shifting statute. "[T]he term 'prevailing party' [is] a legal term of art." *Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Resources*, 532 U.S. 598, 603 (2001). "Our respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail. We have held that even an award of nominal damages suffices under this test." *Id.* (citation, internal quotation marks, and alteration omitted).

Applying this standard, we conclude that Griggs is a prevailing party under the district court's original order and under either of the revised orders that we have outlined in our opinion today. Griggs has succeeded in rescinding his original TPS election and will now receive a monthly annuity payment rather than a taxable lump-sum distribution. This clearly amounts to some relief on the merits of his claim, thus satisfying the *Buckhannon* definition of a prevailing party. Although Griggs may not personally be satisfied with the extent of his victory, that fact is simply irrelevant to the question of whether he achieved some success on the merits of his claim. Accordingly, we

reject DuPont's claim that Griggs's general disgruntlement prevents him from being considered a prevailing party.

As to the award of attorney's fees and costs, DuPont challenges only Griggs's status as a prevailing party. DuPont does not argue that even as a prevailing party, Griggs is not entitled to an award of fees, *see Martin*, 115 F.3d at 1209-10; *Denzler v. Questech, Inc.*, 80 F.3d 97, 104 (4th Cir. 1996), nor does DuPont challenge the amount of attorney's fees awarded. Because we conclude that Griggs is a prevailing party, we affirm the district court's award of attorney's fees.[8]

IV.

For the foregoing reasons, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

WILKINS, Chief Judge, concurring in part and dissenting in part:

I concur in the majority opinion except to the extent that it affirms the attorney's fee award. I would vacate that award and direct the district court to reconsider on remand the issue of Griggs' entitlement to attorney's fees.

From the beginning of this suit, the primary disputed issue has been Griggs' entitlement to compensation for the unanticipated tax burden

---

[8]During oral argument, we raised the possibility of modifying the district court's remedy in the manner set forth in this opinion, and at DuPont's request, we permitted the parties to file supplemental briefs addressing that proposal. In its supplemental brief, DuPont did not address the attorney's fees question at all and thus did not make even an alternative argument that a remand for reconsideration of the amount of attorney's fees award would be required if this court were to adopt the proposed remedy. Accordingly, we believe that our consideration of the attorney's fees question is properly limited to the single issue raised by DuPont—whether Griggs is a prevailing party.

he incurred when he received the lump sum distribution. DuPont has steadfastly maintained that Griggs is not entitled to such compensation or to any other remedy that shifts the risk of tax loss to DuPont. When the district court awarded Griggs just such a remedy, it also awarded him attorney's fees.

In exercising its discretion to award attorney's fees to Griggs as a prevailing party under ERISA, the district court considered five factors, including "the relative merits of the parties' positions," which the court ruled "unquestionably favor[ed] Griggs." J.A. II 302, 304. In determining the amount of fees to award, the district court considered 12 factors, "the most critical" being "the amount in controversy and the results obtained." *Id.* at 306 (internal quotation marks omitted). The district court concluded that "Griggs was fully successful in this litigation" and therefore "decline[d] to reduce Griggs's attorney's fee award to account for limited success in the litigation." *Id.* at 307. Based on all of these factors, the district court awarded Griggs $39,878 in attorney's fees, the full amount that Griggs had requested.

On appeal, we now hold that the district court erred in shifting the risk of tax loss to DuPont, and we therefore vacate the order granting relief and direct the district court to provide an alternative remedy. In so doing, we reverse the district court ruling on the critical issue in this case. Indeed, given an opportunity to comment on the alternative remedy that we first proposed at oral argument, Griggs stated that because it left the tax loss burden with him, it "would fail to restore [him] to the *status quo ante* and would place him effectively in the same position" he would be in without any relief. Griggs' Supplemental Br. at 7. Suffice it to say that, if Griggs has succeeded in any real sense on the merits of his case after our opinion, it is to a far lesser degree than he did in the district court.

In my view, the fee award is nullified by our vacatur of the merits remedy on which the fee award was based. *See Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1210 (4th Cir. 1997) ("[W]e have often indicated that reversal of a judgment under ERISA also requires reversal of any attendant award of attorneys' fees."); *Pedigo v. P.A.M. Transp., Inc.*, 98 F.3d 396, 398 (8th Cir. 1996) ("[A]n order awarding attorney's fees based on a party having prevailed in a trial court cannot survive the reversal of that party's judg-

ment on appeal."). I would so hold and direct the district court to reconsider the question of Griggs' entitlement to attorney's fees in light of his now-reduced degree of success. *See Larez v. Holcomb*, 16 F.3d 1513, 1522-23 (9th Cir. 1994) (holding that appellate court order of new trial on damages warranted vacatur of attorney's fee award and reconsideration of the fee issue by the district court); *Huemmer v. Mayor of Ocean City*, 632 F.2d 371, 373 (4th Cir. 1980) (per curiam) (holding that when district court awarded attorney's fees to plaintiff after ruling that ordinance plaintiff challenged was unconstitutional but that the city and mayor were not liable for damages, our reversal of the damages ruling operated to vacate the fee award and allow plaintiff to reapply for fees once the amount of damages had been determined). By deciding the fee award issue ourselves, we are effectively usurping the authority of the district court to decide the issue in the first instance. *See Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1028 (4th Cir. 1993) (en banc) ("ERISA places the determination of whether attorneys' fees should be awarded in an ERISA action completely within the discretion of the district court."); *Dague v. City of Burlington*, 976 F.2d 801, 804 (2d Cir. 1992) (holding that "when questions are presented such as the amount of recovery [and] the extent to which a plaintiff is a prevailing party, . . . determination of a reasonable attorney's fee under the fee-shifting statutes should normally be decided by the district court in the first instance").

The majority apparently concludes that DuPont waived any right it had to vacatur of the attorney's fee award because its only specific argument challenging the fee award was that the remedy provided by the district court did not entitle Griggs to prevailing party status. *See* ante, at 22 ("As to the award of attorney's fees and costs, DuPont challenges only Griggs's status as a prevailing party. DuPont does not argue that even as a prevailing party, Griggs is not entitled to an award of fees, nor does DuPont challenge the amount of attorney's fees awarded." (citations omitted)). But this conclusion overlooks that DuPont is entitled to vacatur of the fee award because of its successful merits argument on appeal; its argument specifically challenging the fee award based on the judgment of the district court is thus irrelevant. *See Smiddy v. Varney*, 665 F.2d 261, 268 (9th Cir. 1981) (rejecting all of defendants-appellants' arguments regarding attorney's fee award but ordering that "if damages are substantially reduced on

remand the [district] court should reconsider the amount of the attorney's fees award").\*

In essence, the majority penalizes DuPont for not challenging the ruling that our new remedy could support the fee award—even though no court had ever made that ruling at the time DuPont filed its briefs. Even if DuPont had some duty to object in anticipation of our reasonably foreseeable rulings, I still would find no waiver. For the reasons I have discussed, DuPont could not have been expected to predict that despite reversing the district court on the critical issue in this case and vacating the order on which the fee award was based, we would nonetheless leave the fee award intact.

For all the foregoing reasons, I would vacate the attorney's fee award and direct the district court to revisit the fee issue on remand.

---

\*In any event, DuPont specifically argued in its initial brief that if we vacate the merits relief awarded by the district court, we must also vacate the fee award. *See* Br. for Appellant at 38 (asserting that "if this Court agrees that the relief ordered by the district court violates applicable principles of limitation on appropriate equitable relief under ERISA, . . . and accordingly reverses leaving Griggs with no remedy, then Griggs will obviously not be a prevailing party and would not be entitled to his fees or costs," and quoting *Martin*, 115 F.3d at 1210, for the proposition that "reversal of a judgment under ERISA also requires reversal of any attendant award of attorneys' fees" (internal quotation marks omitted)). While this argument does not address the specific scenario in which this court vacates the district court remedy and awards substitute relief, DuPont certainly cannot be blamed for failing to anticipate that particular scenario in preparing its initial brief.

After oral argument, DuPont, noting the alternative remedy that we had proposed during oral argument, moved successfully for leave to file a supplemental brief addressing "whether partial rescission is an available and otherwise appropriate equitable remedy." Appellant's Mot. for Leave to File Supplemental Br., at 2. The majority apparently rests its waiver holding, at least in part, on DuPont's failure to address the attorney's fee issue in that brief. *See* ante, at 22 n.8. However, because DuPont was not granted leave to address the additional issue of what legal effect our granting partial rescission would have on the attorney's fee award, DuPont was not authorized to address that issue. Consequently, it should not be penalized for not doing so.